**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**JOHN MEZZALINGUA ASSOCIATES, INC.,**
**d/b/a PPC,**

                *Plaintiff/Counterclaim-Defendant*,

   -*vs*-

**CORNING GILBERT INC.,**

                *Defendant/Counterclaim-Plaintiff.*

Civil Action No.
5:11-cv-00761-GLS-DEP

**DEFENDANT CORNING GILBERT INC.'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.      INTRODUCTION...................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................1

      A.      Background of This Litigation.................................................................1

      B.      The Patents-in-Suit ..................................................................................2

            1.      Specification of the Patents-in-Suit ..........................................2

            2.      The Claims at Issue ....................................................................7

            3.      The First and Second Ends of the Connector Body...........................9

            4.      During Prosecution, PPC Surrendered Coverage of A
                  Connector Body That Is Not Deformed Inwardly ...........................10

      C.      The Accused Connectors .......................................................................12

III.    APPLICABLE LAW ...........................................................................................15

      A.      Patent Infringement...............................................................................16

      B.      Claim Construction................................................................................16

      C.      Prosecution History Estoppel...............................................................17

IV.     ARGUMENT........................................................................................................18

      A.      The Construction of the Claim Term "Connector Body"...........................18

      B.      Properly Construed, The Patents-in-Suit Are Not Literally Infringed ......22

      C.      The Accused Connectors Cannot Infringe Under the Doctrine of
            Equivalents ..............................................................................................23

V.      CONCLUSION ....................................................................................................25

DC439927.4

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C. Auckerman Co. v. R.L. Chaides Construction Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)....................................................................................2

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*,
   265 F.3d 1294 (Fed. Cir. 2001)...............................................................................18, 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)....................................................................................................15

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)..............................................................................18, 23, 24, 25

*Honeywell International, Inc. v. Hamilton Sunstrand Corp.*,
   370 F.3d 1131 (Fed. Cir. 2004) (*en banc*) ....................................................17, 23

*John Mezzalingua Associates v. Arris International, Inc.*,
   No. 03-C-353-C, 2003 U.S. Dist. LEXIS 24730 (W.D. Wisc. Nov. 14, 2003).........7

*Laitram Corp. v. Rexnord, Inc.*,
   939 F.2d 1533 (Fed. Cir. 1991)...................................................................................16

*Loctite Corp. v. Ultraseal, Ltd.*,
   781 F.2d 861 (Fed. Cir. 1985).....................................................................................23

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370 (1996) ................16, 17

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
   602 F.3d 1306 (Fed. Cir. 2010)...............................................................................18, 23

*MediaCom Corp. v. Rates Technology, Inc.*
   4 F. Supp. 2d 17 (D. Mass. 1998) ..............................................................................16

*National Presto Industries, Inc. v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996).....................................................................................24

*Omega Engineering, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)...............................................................................18, 23

*PC Connector Solutions, LLC v. Smartdisk Corp.*,
   406 F.3d 1359 (Fed. Cir. 2005)...................................................................................24

ii

*Philips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)..................................................................16, 17

*Retractable Technologies, Inc. v. Becton, Dickinson & Co.*,
  653 F.3d 1296 (Fed. Cir. 2011)..............................................................17, 21, 22

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001)........................................................................24

*Southwall Technologies, Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)..........................................................................16

*Techsearch LLC v. Intel Corp.*,
  286 F.3d 1360 (Fed. Cir. 2002)...................................................................16, 23

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)..........................................................................17

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
  520 U.S. 17 (1997).................................................................................16, 23, 24

*Wavetronix v. EIS Electronic Integrated Systems*,
  573 F.3d 1343 (Fed. Cir. 2009)........................................................................16

*White v. Dunbar*,
  94 U.S. 568 (1876)............................................................................................17

## STATUTES

35 U.S.C § 112.......................................................................................................10

## RULES

FED. R. CIV. P. 56(a) ..............................................................................................15

FED. R. CIV. P. 56(c) ..............................................................................................15

## OTHER AUTHORITIES

L. Carroll, *Through the Looking Glass*, Ch. 6 (1972) ..................................18

DC439927.4

## I.      INTRODUCTION

Corning Gilbert Inc. ("Corning Gilbert") files this memorandum in support of its motion for summary judgment of non-infringement.

Corning Gilbert will show that under a construction of the term "connector body/cylindrical body member" based on the intrinsic evidence, Corning Gilbert does not literally infringe any claim of U.S. Patents Nos. 6,558,194 and 6,848,940.  Corning Gilbert will further show that plaintiff is precluded from relying on the doctrine of equivalents in this case due to prosecution history estoppel and that, in any event, no reasonable jury could find infringement under the doctrine of equivalents.  Hence, summary judgment of non-infringement is proper.

## II.     FACTUAL BACKGROUND

### A.      Background of This Litigation

Plaintiff, John Mezzalingua Associates, Inc. d/b/a PPC (hereafter "PPC"), alleges that Corning Gilbert infringes U.S. Pat. Nos. 6,558,194 (the '194 Patent) and 6,848,940 ("the '940 Patent") (collectively, "Patents-in-Suit").  SMF[1] at ¶ 1.

The accused products are connectors used to connect coaxial cable to devices such as computers, DVD players and televisions.  Corning Gilbert's accused products are sold under the brand names UltraRange® and UltraShield™ ("Accused Connectors").  SMF at ¶ 2.  PPC has known of the Accused Connectors for years and never accused them of infringement until now.

Corning Gilbert introduced the accused UltraRange® connector in 2004.  It has been selling it in head-to-head competition with PPC for over seven years.  Burris Aff. at ¶ 8.  In that time, Corning Gilbert has sold over 200 million units of the UltraRange® connector.  Burris Aff.

---

[1] The undisputed material facts are set forth in Corning Gilbert's L.R. 7.1(A)(3) Statement of Material Facts ("SMF").

at ¶ 9.[2]  In fact, the UltraRange® connector has been on sale so long that a presumption of laches applies in this case.  *See A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992).  Despite filing ten lawsuits on the '194 Patent over the years, PPC—a very litigious company—never accused the UltraRange® and UltraShield™ of infringement until this case.  In 2008, PPC brought an action in the International Trade Commission (ITC) seeking an exclusion order based on the '194 Patent.  However, PPC did not name Corning Gilbert as a respondent and did not seek to exclude Corning Gilbert's UltraRange® connector from importation.  Only recently, after losing a large contract to Corning Gilbert, did PPC seek to accuse these connectors of infringement and interfere with Corning Gilbert's supply channel and customer contracts.

The reason PPC never previously challenged these connectors is clear.  They simply do not infringe the Patents-in-Suit.  Indeed, Corning Gilbert has its own patent on its connector, U.S. Patent No. 7,182,639.  Stein Aff., Exh. 7.  Only by taking an unrealistic, "nose of wax" construction of what the claims cover can PPC even assert infringement.  On a reasonable construction of one term in each patent, non-infringement is evident.

### B.      The Patents-in-Suit

The Patents-in-Suit are related and share an identical specification.  SMF at ¶ 3.  The original application for patent was filed in 1997.  After being narrowed to define around prior art, as will be described below, this application issued as U.S. Patent No. 6,153,830 and is not asserted in this case.  PPC filed a continuation application in July 2000.  SMF at ¶ 4.  This ultimately issued as the '194 Patent in 2003.  The '940 Patent-in-Suit is a continuation of the '194 Patent application.  SMF at ¶ 3.

### 1.      Specification of the Patents-in-Suit

---

[2] The accused UltraShield™ connector was introduced in 2010 (Burris Aff. at ¶ 11), but has the same structure for attachment to a cable as the UltraRange® (SMF at ¶ 25).

The `194 Patent is directed to a connector used to couple cable to equipment ports.  The patent states that the invention is particularly useful as a connector for coaxial cables of the type used in the cable television industry. SMF at ¶ 7 ('194 Patent, col. 1, ll. 8-12).

The patent explains that coaxial cable typically contains a center conductor surrounded by an outer braid conductor.  The center and braid conductors are separated by a foil and an insulating layer.  SMF at ¶ 8 (*Id.*, col.1, ll. 21-26).  An outer protective jacket covers the cable. *Id*.



When a connector is to be attached to the cable, the cable is "prepared," by removing layers of the cable end to expose the center and braid connector. SMF at ¶ 15 (*Id.*, col. 6, ll. 38-44).

The '194 Patent states that conventional coaxial cable connector includes an inner, cylinder shaped post that is inserted into a prepared cable between the foil layer and the braid layer.  SMF at ¶ 8 (*Id.*, col. 1, ll. 21-26).  A conventional coaxial cable also has an outer component designed to coact with the center post to secure and seal the outer part of the exposed cable braid and jacket.  SMF at ¶ 9 (*Id.*, col. 1, ll. 40-43).  It is apparent that, as part of the coaxial cable outer jacket has been removed in preparing the cable, a portion of the connector body must cover the exposed portion of the cable and that some mechanism must be provided to seal the device to avoid moisture contacting the exposed braid connector.

The '194 Patent has just this structure.  As seen for example in Figure 5 of the patent, the `194 Patent has central cylindrical post (26) that is inserted into the cable.  An outer connector

body (24) is attached to the post and covers the exposed outer portion of the prepared braided conductor (16) and cable jacket (22).



**'194 Patent, Figure 5**

SMF at ¶ 6 (*Id.*, Fig. 5). The connector also has a nut (44) to attach the cable to a computer or DVD, and a fastener (40), described in detail below.

The patent explains that "radial compression type" connectors were known in the prior art. In that type of connector, the outer body component is substantially non-deformable. SMF at ¶ 11 (*Id.*, col. 1, ll. 50-55). Rather, a sleeve attached to the fastener was moved axially to grip the connector. *Id.* The patent says that this type of connector suffers from disadvantages. Specifically, the before being mounted to the cable the connector was in two pieces and parts were prone to being lost. SMF at ¶ 11 (*Id.*, col. 1, ll. 60-67). The patent further explains that "[a]nother known shortcoming of known connectors is the need for an O-ring or similar sealing member to prevent moisture from penetrating the end connector between the connector body and the outer sleeve component." SMF at ¶ 12 (*Id.*, col. 2, ll. 20-24).

The connector of the `194 Patent is supposed to solve these problems with the prior art. In particular, the sleeve that grips the cable is now made an integral part of the connector body.

Further, by designing this integral connector body/sleeve to deform, the patent obviates the need for a seal.

As seen in Figure 1 from the '194 Patent, the connector has a central post member (26) that is designed to be inserted into the prepared cable.  SMF at ¶ 15 (*Id.*, col.6, ll. 50-52).



**'194 Patent, Figure 1**

SMF at ¶ 5 (*Id.*, Fig. 1).  In every embodiment of the '194 Patent, the connector also has a unitary connector body (24) that is attached to the post at the end near the nut and surrounds the central post to form a bore (36) between the connector body and the post.  The open end of the connector body defines a cylindrical sleeve that is deformed by the movement of the fastener. SMF at ¶¶ 17, 21 (*Id.*, col. 7, ll. 5-7 and Claim 1, element "e").  The patent teaches that the connector body is either "metallic" or "formed from reinforced plastic material."  SMF at ¶ 14 (*Id.*, col. 3, ll. 30-34).  In other words, it is a unitary, relatively rigid structure.  Preferably, the connector body and post are formed of the same material.  SMF at ¶ 16 (*Id.*, col. 6, l. 63 – col. 7, l. 4).

The connector also has a "fastener member" 28, which is sometimes called a "compression ring," especially in the '194 Patent claims. The fastener is initially attached to the connector body in a first position, as shown in Figure 1.  SMF at ¶ 17 (*Id.*, col. 7, ll. 31-61).

However, the fastener is capable of being moved to a second position, as described below.  SMF at ¶ 17 (*Id.*, col.7, ll. 51-60).  As shown in Figures 1 and 4, the fastener has a ramped inner wall (66) so that the inner diameter of the rear part of the fastener is smaller than the diameter of the connector body.

A prepared cable is inserted into the connector by placing the center conductor and insulating layer into the inner cavity 34 in the post and the braid conductor and cable jacket into the bore 36 formed between the post and connector body.  SMF at ¶ 19 (*Id.*, col. 8, ll. 9-22).

After the cable is inserted, the connector is secured by moving the fastener member to its second or closed position.  This movement is shown in Figures 1 and 5 of the '194 Patent:



'194 Patent, Figure 1                    '194 Patent, Figure 5

SMF at ¶¶ 5-6 (*Id.*, Figs. 1, 5).  The movement of the fastener member to the second position causes the cylindrical sleeve at the end of the connector body to be deformed radially inwardly to contact the cable jacket 22, as shown in Figure 5.  SMF at ¶ 6 (*Id.*, Fig. 5).  As a result, the outer portion of the cable is firmly gripped and clamped between the central post and connector body (24).  SMF at ¶¶ 20, 21 (*Id.*, col.8, ll. 38-48 and Claim 1, element "e").

Preferably the clamping of the connector body against the cable forms a continuous seal about the cable jacket.  SMF at ¶ 20 (*Id.*, col. 8, ll. 48-51).  The patent teaches that

"advantageously," the design of the '194 Patent eliminates "the need for an O-ring or other seal between the connector body 24 and the fastener member 28."  SMF at ¶ 20 (*Id.*, col. 8, ll. 54-57).

Thus, in the '194 Patent, the outer connector body is deformed inwardly by the fastener member to secure and seal the connector to the cable.

### 2.    The Claims at Issue

The claims at issue all claim the feature of a connector body (called a "cylindrical body member" in the '194 Patent claims) that is deformed inwardly by the fastener.[3]  SMF at ¶¶ 21-25.

Claim 1 of the '194 Patent is representative.  It provides:

1.    A connector for coupling an end of a coaxial cable to a threaded port, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric being surrounded by a conductive grounding sheath, and the conductive grounding sheath being surrounded by a protective outer jacket, said connector comprising:

> a. a tubular post having a first end adapted to be inserted into an exposed end of the coaxial cable around the dielectric thereof and under the conductive grounding sheath thereof, said tubular post having an opposing second end;
>
> b. a nut having a first end for rotatably engaging the second end of said tubular post and having an opposing second end with an internally threaded bore for threadedly engaging the threaded port;
>
> c. *a cylindrical body member having a first end and a second end, the first end of said cylindrical body member including a cylindrical sleeve* having an outer wall of a first diameter and an inner wall, *the inner wall bounding a first central bore extending about said tubular post*, the second end of said cylindrical body member engaging said tubular post proximate the second end thereof, *said cylindrical sleeve having an open rear end portion for receiving the outer jacket of the coaxial cable, said open rear end portion being deformable;*

---

[3] The terms "connector body" and "cylindrical body member" are used synonymously in the patent specification.  *See* Stein Aff., Exh. 2 ('194 Patent, col. 6, ll. 48-50); *see also* Stein Aff., Exh. 8 (*John Mezzalingua Assoc. v. Arris Int'l, Inc.*, No. 03-C-353-C, 2003 U.S. Dist. LEXIS 24730, at *27 (W.D. Wisc. Nov. 14, 2003)).

d. *a compression ring having* first and second opposing ends and having *a central passageway* extending there through between the first and second ends thereof, the first end of said compression ring having a first non-tapered internal bore of a diameter commensurate with the first diameter of the outer wall of said cylindrical sleeve for allowing the first end of said compression ring to extend over the first end of said cylindrical body member, *the central passageway of said compression ring including an inwardly tapered annular wall* leading from the first internal bore and narrowing to a reduced diameter as compared with the first diameter; and

e. *said inwardly tapered annular wall causing said rear end portion of said cylindrical sleeve to be deformed inwardly toward said tubular post and against the jacket of the coaxial cable as said compression ring is advanced axially over the cylindrical body member toward the second end of said cylindrical body member*

SMF at ¶ 21 ('194 Patent, Claim 1) (emphasis added).

Corning Gilbert had previously patented a connector where the cylindrical body member was compressed by the fastener member to secure the cable between the outer connector body and the central post.  *See* U.S. Patent No. 5,997,350 (Stein Aff., Exh. 9)  The claims of the '194 Patent were copied by PPC from the Corning Gilbert '350 patent to try to provoke an "interference" regarding ownership of those claims.  SMF at ¶ 44.  Thus, the claims of the '194 Patent use slightly different terms than in the specification of the patents and the claims of the '940 patent (*e.g.*, "connector body" vs. "cylindrical body member," and "fastener member" vs. "compression ring").

The independent claims of the '940 Patent are similar to the claims of the '194 Patent and also claim "a connector body" that is deformed inwardly.  SMF at ¶¶ 23-25.  For example, claim 1 provides, in relevant part:

1.      A connector for coupling an end of a coaxial cable to a threaded port, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric being surrounded by a protective outer jacket, said connector comprising:

* * *

b. ***a connector body having a first end and a second end***, the first end of said connector body having an outer wall and an inner wall, the second end of said connector body operatively attached to said post, ***the inner wall bounding a first central bore extending about said post for receiving the coaxial cable within the first central bore, said first end of said connector body member being deformable; and***

c. ***a fastener member*** having a first end and a second opposing end with a central passageway…***the central passageway being dimensioned to compress the connector body radially inwardly*** to decrease the volume of the first central bore when the fastener member is slidingly moved from the first preinstalled configuration toward the second end of the connector body, wherein ***said fastener member causes said connector body to be deformed inwardly toward said post and against the protective outer jacket of the coaxial cable as said fastener member is advanced over the connector body*** toward the second end of said connector body.

SMF at ¶ 23 ('940 Patent, claim 1). All the independent claims of the '940 Patent have this limitation. SMF at ¶¶ 23-25.

Thus, every claim at issue claims a connector body/cylindrical body member having a first and second end. Moreover, all the independent claims require that the connector body to be deformed inwardly toward the connector post by a fastener member/compression ring that compresses the connector body against the outer jacket of the coaxial cable. *See* SMF at ¶¶ 21-25.

### 3.     The First and Second Ends of the Connector Body

As PPC disputes what portion of the connector constitutes the claimed connector body/cylindrical sleeve, it is worthwhile to note that PPC specifically identified the location of the first and second ends of the connector body/cylindrical sleeve during the prosecution of the '194 Patent.

When PPC copied the claims from the Corning Gilbert '350 Patent into its application, it sought to demonstrate to the Patent & Trademark Office ("PTO") that the '194 Patent's specification contained written description support for those claims. *See* 35 U.S.C. § 112, ¶ 1.

To do so, it presented a chart that explained to the PTO where each element of the claims was supported by the '194 Patent's specification and drawings. PPC identified the claimed connector body/cylindrical body member as corresponding to the outer body member 24 in Figure 1. PPC's chart identified the "first" and "second" ends of the connector body as, respectively, to the right and left ends of connector body 24 in Fig. 1. SMF at ¶ 46. Thus, PPC told the PTO during prosecution that the first and second ends of the cylindrical body member/connector body correspond to the two ends of the outer connector body that surrounds the tubular post, item 24, in the '194 Patent figures.

> **4.     During Prosecution, PPC Surrendered Coverage of A Connector Body That Is Not Deformed Inwardly**

The prosecution history of the Patents-in-Suit demonstrates that the inwardly deformable connector body limitation was added to the claims of Patents-in-Suit to define around prior art that uses a structure similar to the structure used in the Corning Gilbert connectors—namely a system where a gripping member slides underneath the connector body to secure the cable while the connector body does not deform.

When PPC applied for the Patents-in-Suit, the originally filed claims did not claim a connector body that deformed radially inward. SMF at ¶ 36. Rather, the originally filed independent claims required only that the movement of the fastener reduce the volume of the cavity between the connector body and the central post. SMF at ¶ 36.

In the first Office Action during prosecution of this application, however, those claims were rejected as unpatentable in view of U.S. Pat. No. 5,470,257 ("the Szegda '257 Patent").

SMF at ¶ 37.[4]  The prior art Szegda '257 Patent cited by the PTO is shown below.  The locking

member has a gripping portion (colored in red).



SMF at ¶¶ 43-44 ('257 Patent, Fig. 6 and col. 4, l. 52—col.5, l. 10).  To clamp the connector,

locking member 26 is screwed and is thereby advanced to the left (in the figure).  SMF at ¶ 44

(*Id.*, col. 4, l. 52—col.5, l. 10).  As the locking member moves towards the connector body, the

gripping portion (red) again moves with the locking member and slides under the connector body

to secure the cable.[5]

In response to the rejection over the Szegda `257 Patent, PPC amended its claims.  PPC

amended the independent claims to recite that the fastener member moves to a second position

"so as to push at least a ***portion of the connector body*** inwardly."  SMF at ¶ 38 (emphasis

added).

In the accompanying remarks, PPC told the PTO that the Szegda '257 Patent "***in no way***

***teaches or suggests pushing the connector body inwardly as is presently claimed*** [in the now

---

[4] The Szegda '257 Patent is one of the class of "radial compression connectors" that the '194
Patent distinguished as prior art. Indeed, the Corning Gilbert '350 Patent, from which PPC
copied the '194 Patent claims, specifically identifies the Szegda '257 Patent as a radial
compression connector.  Stein Aff., Exh. 9 ('350 Patent) at col. 2, ll. 18-37.

[5] The gripping portion also moves radially inwardly against the coaxial cable.  When the
shoulder is dislodged from its detent position it presses against the inner wall of the connector
body 22, moving the balance of the gripping portion inwardly.

amended claims]."  SMF at ¶ 39 (emphasis added).  From that point on, an inwardly deformable connector body was included as a limitation of all the claims presented during prosecution of the Patents-in-Suit.

Thus, in order to overcome the rejection based on the Szegda '257 Patent, PPC amended its claims to require that the ***connector body—and not a gripping member or some other part of the fastener***—be deformed radially inwardly to secure the connector to the cable.  *See* SMF at ¶ 38.  This amendment distinguished the Patents-in-Suit from the prior art connector having a connector body that remains stationary and undeformed.

### C.    The Accused Connectors

Physical samples of the UltraRange® and UltraShield™ connectors as well as cut-away samples of those connectors are exhibits to the Burris Affidavit.  Burris Aff. at ¶¶ 12-14.  Also attached to the Burris Affidavit is a 30-second animation showing operation of the Corning Gilbert Accused Connectors.[6]  The operation of the Accused Connectors is undisputed and has been known to PPC for many years.[7]  The component parts of the UltraRange® connector are depicted below:

---

[6] This animation was prepared in 2009 to explain the product to customers.  It was not prepared for purposes of this litigation.  Burris Aff. at ¶15.

[7] While not material to this motion, in the 2003 litigation between PPC and Corning Gilbert concerning different connectors, Corning Gilbert was enjoined from infringing the '194 Patent.  The UltraRange® was introduced shortly after that litigation ended in order to "design around" the '194 Patent.  Burris Aff. at ¶ 10.  Hence, it is likely that PPC examined the UltraRange® connector **immediately** after it was introduced to determine if it infringed or was in violation of the 2003 injunction.  As we understand it, at the Status Conference in this case PPC conceded that the UltraRange® connector does not violate the 2003 injunction.



Post
(Tin/Brass)

(4)

O-ring
(Rubber)

(2)

Nut
Ni/Brass)

(1)

Body
(Ni/Brass)

(3)

Gripping
Member
(Plastic)

(5)

Shell
(Ni/Brass)

(6)

SMF at ¶ 32.  The manufacturing drawing for the Ultra Range connector refers to the component parts as the coupling nut (1), coupling nut O-ring (2), connector "body" (3), "post" (4), gripping member (5) and, shell (6).  SMF at ¶ 30.  Likewise, the Corning Gilbert patent on this device refers to the connector body as the "hollow body" and refers to the gripping member as a "deformable gripping ring."  Stein Aff., Exh. 7 ('639 Patent) at col. 14, ll. 33-40.  As explained in that patent, the connector body and post are made of nickel plated brass and the deformable gripping ring is made of a plastic such as acetyl.  *Id.* at col. 14, ll. 41-49.

The components are assembled into two subassemblies:  a body portion attached to the nut and fastener/shell portion, containing the shell and gripping member, as shown in the figure below.  In the assembly process, the gripping member is attached to the shell.



SMF at ¶ 31.  Finally, the fastener/shell portion is press fit onto the body to make an assembled connector as shown below:



SMF at ¶ 32.

The operation of the accused devices can be readily understood with reference to the following diagram of the UltraRange® connector. The accused UltraShield™ connector is attached to a coaxial cable in the same way. SMF at ¶ 25.

**ULTRARANGE® CONNECTOR**



**Unengaged/Open Position**

**Engaged/Closed Position**

SMF at ¶¶ 27-28.

The UltraRange® connector has a central post that is inserted into the cable as is conventional in this type of connector. The UltraRange® connector also has a connector body member that surrounds the post (colored gold). One end of the connector body is attached to the post near the nut and the other end extends around the post and defines a chamber to receive the

exposed braid connector and cable jacket.  However, in the accused devices, the connector body does not deform.

      After the cable is inserted into the connector, the fastener/shell is moved by a tool to the engaged/closed position.  The shell slides over the connector body and does not deform the connector body inwardly.  SMF at ¶¶ 33-35.  At the same time, the plastic gripping member affixed to the shell slides under the connector body to securely grip the cable.  SMF at ¶ 34.[8] The gripping member also forms an environmental seal between the shell and connector to prevent moisture from seeping into the chamber where the exposed portion of the cable is held. SMF at ¶ 34.

### III.    APPLICABLE LAW

      Summary judgment is appropriate if the pleadings, the discovery, disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); FED. R. CIV. P. 56(c). Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *See id.*  Thus, for the purposes of this motion, Corning Gilbert need only show

---

[8] On the manufacturing drawing, the Court will note that the end of the gripping member closest to the connector body is assembled so that the front edge of the gripping member is adjoining the tapered end portion of the connector body.  This assures that when the shell/fastener is closed, the gripping member slides along the rearward-facing tapered portion of the connector body and then under the connector body.  Burris Aff. at ¶ 17.  However, as the Corning Gilbert patent teaches, the gripping ring need not touch or contact the tapered portion of the connector body.  It could equally be disposed forward of the rear end of the connector body.  Stein Aff., Exh. 7 ('639 Patent, col. 15, ll. 31-35).

that one limitation of each asserted claim is not met by the Accused Connectors to be adjudged

to be non-infringing, as a matter of law. *See, e.g., Wavetronix v. EIS Elec. Integrated Sys.,* 573

F.3d 1343, 1358-59 (Fed. Cir. 2009); *Techsearch LLC v. Intel Corp.*, 286 F.3d 1360, 1381 (Fed.

Cir. 2002); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

### A.     Patent Infringement

A patent infringement analysis is a two-step process.  First, the scope of the claims is

determined. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en

banc*), *aff'd* 517 U.S. 370 (1996).  Because determining the scope of the claims is a matter of

law, *Markman,* 52 F.3d at 970-71, it appropriately may be done in the context of a motion for

summary judgment. *See, e.g., MediaCom Corp. v. Rates Tech. Inc.,* 4 F. Supp. 2d 17, 22-23 (D.

Mass. 1998).  Second, the properly construed claim is compared with the accused device to

determine whether all of the claim limitations are present in the accused product. *Markman*, 52

F.3d at 970-71.  If even one limitation of an independent claim is not met, there can be no

infringement. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

### B.     Claim Construction

It is a "bedrock principle" of patent law that "the claims of a patent define the invention

to which the patentee is entitled the right to exclude." *Philips v. AWH Corp.*, 415 F.3d 1303,

1312 (Fed. Cir. 2005) (citations omitted).  However, a patent claim is not a "nose of wax" that

can be twisted and shaped in whatever direction the patentee chooses. *Southwall Techs., Inc. v.

Cardinal IG Co.,* 54 F.3d 1570, 1578 (Fed. Cir. 1995).

Words in a claim are generally given their ordinary and customary meaning; this

"ordinary and customary" meaning of a claim term is one that would be understood by a person

of ordinary skill in the art at the time of the invention. *Philips*, 415 F.3d at 1312-13.  The person

of ordinary skill in the art is deemed to read the claim terms not only in the context of the

particular claim in which they appear, but in the context of the entire patent, including the

specification and prosecution history, which together comprise the intrinsic evidence. *Id.* at

1313. Because a patentee is required to define precisely what his invention is, it is improper to

construe a patent's claims in a manner different than the plain import of its terms. *White v.*

*Dunbar,* 94 U.S. 568, 570 (1876).

 The Federal Circuit has provided specific guidance on rendering a proper claim

construction in a patent case, setting out a tripartite analysis of the intrinsic evidence. *Markman*,

52 F.3d at 979. First, the words of the claims themselves, both asserted and not, are considered.

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Second, the patent's

specification must be reviewed to determine whether the inventor has used any claim terms in a

manner inconsistent with their ordinary meaning. *Id.* at 1582-83. "Claims must be read in view

of the specification, of which they are a part." *Id.* (citations omitted). *Retractable Techs., Inc. v.*

*Becton, Dickinson & Co.*, 653 F.3d 1296, 1304-05 (Fed. Cir. 2011). Third, the prosecution

history of the patent should be considered. This history contains the complete record of all the

proceedings before the U.S. Patent & Trademark Office, including any express representations

made by the applicant regarding the scope of the claims. *Id.* This record is "often of critical

significance in determining the meaning of the claims." *Id.*

 **C.**  **Prosecution History Estoppel**

 Prosecution history estoppel may bar the patentee from asserting infringement under the

Doctrine of Equivalents if the scope of the asserted claims has been narrowed by amendment or

arguments made during prosecution. *See, e.g., Honeywell Int'l, Inc. v. Hamilton Sunstrand*

*Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (*en banc*). Indeed, prosecution history estoppel

may arise even from amendments and arguments made during prosecution of related patents—

such as a parent patent to the patent-in-suit—because a patent family's entire prosecution history

is reviewed when applying the rule against recapture and prosecution history.  *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 602 F.3d 1306, 1318 (Fed. Cir. 2010); *see Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003); *see also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001).  Amendment-based prosecution history estoppel "arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002).  "A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim."  *Id.* at 740.  Accordingly, a patentee may not assert infringement against an accused device that is found to be within that surrendered "territory."  *Id.*

## IV.   ARGUMENT

### A.   The Construction of the Claim Term "Connector Body"

PPC contends that the plastic gripping member portion of the fastener in the Accused Connectors should be considered to be part of the claimed "connector body/cylindrical body member."  PPC's Preliminary Infringement Contentions at Exhibit A, *passim*.  This *Alice-in-Wonderland* construction is the crux of PPC's infringement theory.[9]  However, if the Court construes the terms "connector body/cylindrical body member" consistent with the patent specification, drawings, and prosecution history, it is apparent that the Accused Connectors do not infringe the Patents-in-Suit.

The claims at issue themselves greatly constrain the structure that can correspond to the claimed connector body/cylindrical body member.  The claims require that connector body have

---

[9] "'When I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'"  L. Carroll, *Through the Looking Glass*, Ch. 6 (1972).

a first and second end.[10]  They require that one end (the "second end") be attached to or engage

the tubular central post and that the inner wall of the connector body "bound" a central bore

about the post.  The other end of the connector body is open.  SMF at ¶ 21 ('194 Patent, Claim

1); SMF at ¶ 23 ('940 Patent, Claim 1).   The `194 claims specifically recite that the first end of

the connector body defines a cylindrical sleeve.  SMF at ¶¶ 21-22 ('194 Patent, Claim 1, element

"c"; Claim 2, element "c").

In every embodiment of the invention disclosed in the '194 Patent Specification, the

connector body is shown as a unitary element 24, which is the outer body element that surrounds

the central post.  Connector body 24 has one end attached to the post and a second end that

terminates roughly near the end of the central post as shown in Figure 1:



**'194 Patent, Fig. 1**

The prosecution history, discussed above, confirms that the claimed first and second ends of the

connector body should be understood with reference to the two ends of element 24 in Figure 1.

Equally noteworthy, the '194 Patent specification makes clear that certain parts of the

connector are <u>not</u> part of the connector body.  The specification makes it clear that the fastener

---

[10] For convenience, we refer to the element to be construed as the "connector body."  The
'cylindrical body member" term in the '194 Patent is synonymous with the "connector body" and
should receive the same construction.

member 28 is a separate component and is not part of the connector body.  SMF at ¶ 13 (*Id.*, col. 2, ll. 33-47); SMF at ¶ 15 (*Id.*, col. 6, ll. 47-52).  Likewise, the patent specification is critical of devices having a separate O-ring or seal member and states that the disclosed connector body eliminates the need for a separate seal.  SMF at ¶ 12 (*Id.*, col. 2, ll. 20-24); SMF at ¶ 20 (*Id.*, col. 8, ll. 54-58).  Thus, a seal is not a part of the connector body.

The background section of the patent acknowledges that prior art "radial compression type" connectors having a separate sleeve that moved axially to confine the cable were known to have shortcomings, including difficulty in handling and the need for a separate seal.  SMF at ¶ 11 (*Id.*, col. 1, l. 51—col. 2, l. 19).  The patent solves this problem by eliminating the separate sleeve and making a portion of the connector body deformable.  Thus, making the connector body itself deformable eliminated the need for separate sleeves and seals, which is the basic idea of the patent.

Likewise, the prosecution history shows that the claimed inwardly deforming connector body was added to the claim to define over the prior art Szegda '257 Patent reference, where the fastener member slid over the connector body without deforming the connector body and a sleeve or gripping portion of the fastener slid under the connector body to grip the cable.  Hence, the prosecution history precludes construing the term "connector body" to include a part of the fastener that slides under the connector body to grip the cable, as that is exactly what the applicant surrender by the amendment that added the requirement that the connector body deform.

Based on all the intrinsic evidence, it is apparent that the gripping portion of the Corning Gilbert connectors is not a part of the connector body under any reasonable interpretation of "connector body."  The gripping member is a separate component, made from a different

material, and is part of the fastener, not the connector body.  The gripping member slides under the connector body to grip the cable and seal the connector, all of which is entirely different from what is disclosed in the Patents-in-Suit.

The Federal Circuit's recent decision in *Rectractable Techs.* is directly on point here. The case dealt with the proper construction of the term "body" in connection with a cylindrical body member in a syringe.  The Court noted that the claim term "body" could not be understood without reference to the specification.  Indeed, the Court noted that "the claim construction process entails more than viewing the claim language in isolation."  *Rectractable Techs.*, 653 F.3d at 1305.  Rather, "it is necessary to review the specification to determine if the proper construction of the term 'body' is limited to a one-piece body."  *Id.*

The specification at issue in *Rectractable Techs.* only disclosed a one-piece cylindrical body.  As in this case, every embodiment of the patent in the *Retractable Techs*. case showed a single piece cylindrical body.  Further, the specification there distinguished prior art systems with multiple piece bodies as having shortcomings.  The Court noted that the specification did not disclose as the invention "a body that consists of multiple pieces or indicates that the body is anything other than a one-piece body."  *Id*.  In light of this, the Court concluded:

> In this case, while the claims leave open the possibility that the recited "body" may encompass a syringe body composed of more than one piece, the specifications tell us otherwise.  They expressly recite that "the invention" has a body constructed of a single structure, expressly distinguish the invention from the prior art based on this feature, and only disclose embodiments that are expressly limited to having a body that is a single piece.  Thus a construction of "body" that limits the term to a one-piece body is required to tether the claims to what the specification indicates the inventor actually invented.

*Id.*

Here, the specification clearly discloses a one-piece outer connector body.  Both the specification and the prosecution history teach that the invention was a one-piece outer body that

deforms inwardly—connectors having a gripping member that slides under the body to grip the cable and seal the connector are not what the applicant invented.  As in *Retractable Techs.*, the Court here should construe the term connector body to cover what the applicant disclosed and reject PPC's attempt to stretch its claims to cover subject matter it clearly did not invent.

Corning Gilbert submits that the Court should construe the term "connector body/cylindrical body member" to mean "the outer portion of the connector assembly that surrounds the tubular post to define a central bore."  That construction comports with the claims, specification, and prosecution history of the patents-in-suit.  PPC's litigation-motivated *Alice-in-Wonderland* construction finds no support in the intrinsic record.

### B.     Properly Construed, The Patents-in-Suit Are Not Literally Infringed

When the terms "connector body" and "cylindrical body member" are properly construed, the accused Corning Gilbert connectors do not infringe.

The Accused Connectors have a connector body (colored gold above, p. 14).  It is the outer part of the connector which is connected to the post on one end and surrounds the post to define a central bore about the post at the other end.  SMF at ¶ 35.

However, the connector body in the Accused Connectors is not deformed inwardly by the connector shell.  SMF at ¶¶ 26-35.  Instead, a separate, plastic gripping member (colored red above, p. 14) is attached to and moves with the shell during the engagement process.  The gripping member slides under the connector body to secure the cable.  SMF at ¶¶33-34.  The plastic  gripping member also forms an environmental seal in the Accused Connectors.  SMF at ¶ 34.  This seal created by the gripping/sealing member is necessary because the connector body does not deform inwardly to contact the cable to form a proper seal.  SMF at ¶ 34.  The fastener/shell element of the Accused Connectors slides over the connector body without deforming it**.**  SMF at ¶ 33; *see also* SMF at ¶¶ 27-32.

Because the connector body in the Accused Connectors is not deformed inwardly, these devices do not literally infringe the claims of the Patents-in-Suit.  All of the claims at issue require that the connector body/cylindrical body member be deformed inwardly toward the post to secure the cable.  Thus, summary judgment of no literal infringement is proper.  *Warner-Jenkinson*, 520 U.S. at 29; *Techsearch*, 286 F.3d at 1381.

**C.      The Accused Connectors Cannot Infringe Under the Doctrine of Equivalents**

As noted above, the limitation that the connector body be deformed inwardly was added during prosecution to overcome a prior art rejection based on the Szegda `257 Patent.  As the amendment was made for reasons related to patentability, prosecution history estoppel bars any scope of equivalents for this claim element.  *Festo Corp.,* 535 U.S. at 736-37.  That the amendment was made in the parent application is of no moment.  When a claim element is amended in a parent application, prosecution history estoppel continues to apply to that claim element when it is presented in later continuation applications.  *MBO Labs*, 602 F.3d at 1318; *see Omega Eng'g*, 334 F.3d at 1333; *see also Advanced Cardiovascular*, 265 F.3d at 1305.

Further, the inwardly deforming connector body limitation was added to the claim to amend the claim to exclude the subject matter of the Szegda `257 Patent.  In making this amendment, PPC surrendered coverage to a connector like the Szegda `257 Patent, where the fastener member slides above the connector body without deforming it and a gripping member slides under the connector body to secure the cable.  The doctrine of equivalents cannot be used to recapture material surrendered during prosecution.  *Festo*, 535 U.S. at 736; *Honeywell*, 370 F.3d at 1139; *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861 (Fed. Cir. 1985) .  Thus, PPC cannot seek to recapture under the guise of equivalents structure, such as that in the Accused Connectors, which it surrendered during prosecution.  Further still, the doctrine of equivalents cannot be applied to eviscerate what is called the "all elements" rule.  The "all elements" rule

requires that every element of a patent claim must be present in an accused product to find patent infringement. *Warner-Jenkinson*, 520 U.S. at 29-30. The Supreme Court emphasized that it "is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Id.* at 29. Thus, the doctrine of equivalents does not apply when an element of the claim is entirely absent in the accused product or service. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001). Accordingly, there can be no infringement under the doctrine of equivalents "[i]f a theory of equivalence would vitiate a claim limitation." *PC Connector Solutions, LLC v. Smartdisk Corp.*, 406 F.3d 1359, 1365 (Fed. Cir. 2005).

Here, the claims of the patents-in-suit all require that the connector body deform inwardly against the jacket of the coaxial cable. To read the claim to cover Accused Connectors—where the connector body does not deform and does not grip the coaxial cable—would be to vitiate the inwardly deformable connector body limitation. The doctrine of equivalents cannot be applied in this fashion. *Id.* In addition, the Accused Connectors are covered by a Corning Gilbert patent, the '639 Patent, which is itself strong evidence of non-equivalence. *E.g., Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996).

Finally, the doctrine of equivalents only applies to "those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through *trivial* changes." *Festo*, 535 U.S. at 733. For infringement to be found under the doctrine of equivalents, there must only be "insubstantial differences" between the claimed invention and the accused product. *Warner-Jenkinson*, 520 U.S. at 39-41.

Here, no reasonable juror could find the differences between the Patents-in-Suit and the Accused Connectors to be insubstantial. The entire crux of the invention described in the

Patents-in-Suit is to improve upon prior art radial compression connectors where the connector body did not deform.  In place of the prior art, the Patents-in-Suit relate to a connector where the connector body itself deforms and by deforming seals the connector and eliminates the need for a separate sealing member.

The Corning Gilbert connectors use none of these features.  Instead, the connector body does not deform, as in the prior art, and a separate seal (the deformable gripping member) is needed to seal the connector.  Every disclosure in the '194 Patent of the cylindrical body member shows a unitary structure made of rigid materials, and nothing discloses or suggests a separate structure for gripping the coaxial cable, much less that the gripping member can be part of the claimed cylindrical body.  In the UltraRange® and UltraShield™ devices, the body and gripping member are not connected to one another, and are made of completely different materials.  Further, the gripping member cannot be a part of the cylindrical body because they are connected to *entirely distinct structures* and move relative to each other in opposite directions.  No reasonable juror could find these changes trivial or insubstantial.  Hence, the doctrine of equivalents is inapplicable in this case.  *Festo,* 535 U.S. at 733.

## V.    CONCLUSION

For the foregoing reasons, there is but one appropriate conclusion: the Accused Connectors do not infringe the Patents-in-Suit as a matter of law.  Accordingly, Corning Gilbert respectfully requests that the Court grant its motion for summary judgment of non-infringement.

Dated:  November 7, 2011

DEWEY & LEBOEUF LLP
HARTER SECREST & EMERY LLP


By:   /s/ Joseph P. Lavelle

Joseph P. Lavelle (admitted *pro hac vice*)
Andrew N. Stein (Bar Roll No. 514620)
DEWEY & LEBOEUF LLP
1101 New York Avenue, NW
Washington, DC  20005-4213
Telephone: (202) 346-8000
Facsimile: (202) 346-8102
E-Mail: joelavelle@dl.com
E-Mail: astein@dl.com

Jerauld E. Brydges (Bar Roll No. 511646)
David M. Lascell (Bar Roll No. 301665)
HARTER SECREST & EMERY LLP
1600 Bausch & Lomb Place
Rochester, NY  14604-2711
Telephone: (585) 232-6500
Facsimile: (585) 232-2152
E-Mail: jbrydges@hselaw.com
E-Mail: dlascell@hselaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff*
*Corning Gilbert, Inc.*