IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHN MEZZALINGUA ASSOCIATES, INC.,
d/b/a PPC,

                    Plaintiff,

                                              Civ. Action No.
                                              5:11-CV-0761 (GLS/DEP)

          v.

CORNING GILBERT, INC.,

                    Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

HISCOCK & BARCLAY, LLP                DOUGLAS J. NASH, ESQ.
One Park Place                       GABRIEL M. NUGENT, ESQ.
300 South State Street               JOHN D. COOK, ESQ.
Syracuse, NY  13202-2078

FOR DEFENDANT:

DLA PIPER LLP                        JOSEPH P. LAVELLE, ESQ.
500 Eighth Avenue NW                 ANDREW N. STEIN, ESQ.
Washington, DC 22004

HARTER SECREST LAW FIRM              DAVID M. LASCELL, ESQ.
1600 Bausch & Lomb Place             ERIKA N.D. STANAT, ESQ.
Rochester, NY 14604                  JERAULD E. BRYDGES, ESQ.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This action involves two direct competitors in the cable and telecommunications industry with a history of prior judicial and administrative intellectual property skirmishes, and who once again find themselves embroiled in a patent dispute.  Plaintiff John Mezzalingua, Inc., d/b/a PPC ("PPC") has commenced this action against defendant Corning Gilbert, Inc. (" Corning Gilbert") alleging infringement of two patents relating to coaxial cable connectors through Corning Gilbert's marketing of its UltraShield and UltraRange series of allegedly infringing connectors.  Corning Gilbert has denied infringement and counterclaimed seeking a declaratory judgment of non-infringement, patent invalidity, and unenforceability, additionally asserting pendent state law counterclaims for intentional interference with business relations, abuse of process, and commercial disparagement.

The parties have sought guidance from the court with respect to ten disputed claim terms appearing within the two patents in suit.[1]  In light of that request the matter has been referred to me by Chief Judge Gary L.

---

[1]     Under this court's local patent rules, which became effective on January 1, 2012 but have been applied to this action, despite having been filed prior to that date, ten is the maximum number of claim terms which may be presented to the court for construction, absent relief from that limitation.  *See* N.D.N.Y. L. Pat. R. 4.4(b).

Sharpe, the assigned district judge, for the issuance of a report and recommendation to him regarding claim construction.  The following constitutes my reported findings and recommendations, based upon comprehensive submissions from the parties and a claim construction hearing conducted by the court.

I.      BACKGROUND

At issue in this action are two patents issued to inventor Noah P. Montena, who is employed at PPC as a Principal Engineer, both of which disclose a cable connector and method of operation.  The first, U.S. Patent No. 6,558,194 (the "'194 Patent"), was issued on May 6, 2003.  The second, U.S. Patent No. 6,848,940 (the "'940 Patent") followed on February 1, 2005.  Both patents relate to connectors used to couple coaxial cable to such devices as televisions, cable boxes, and cable modems.

The technology involved in the two patents and the coaxial cable industry generally is not particularly complex.  Coaxial cables provide a means for transmission of electronic signals, and typically are comprised of four elements, including 1) an outer coating, to act as an environmental seal; 2) a metal braid, or shield, designed to prevent unwanted external

magnetic signals and other influences from interfering with the electrical signals being conveyed by the cable; 3) a dielectric layer, which acts as an insulator; and 4) a center conductor through which the electrical signals travel.  Montena Decl. (Dkt. No. 34-1) ¶ 4.  A coaxial cable connector is typically attached to the end of a length of cable in order to extend the physical and electromagnetic shielding structure of the cable through to the receiving port of the television or other device to which the cable is being attached.  *Id.* at ¶ 5.  The connector typically facilitates attachment to the port through use of a threaded nut or by other similar means.  *Id.*

Early cable connectors utilized a crimping process, usually achieved through use of a hexagonal crimping tool that permanently deformed the connector, causing it to become attached to the cable, in order to attach a connector to a cable end.  Montena Decl. (Dkt. No. 34-1) ¶ 6.  One prominent disadvantage of hexagonal crimping, prompting those in the field to explore better solutions, was the failure of a crimp-type connector to provide a fully enclosed, impregnable seal between connector and cable.  Montena Decl. (Dkt. No. 34-1) ¶ 6.

In the mid-1990's compression-type connectors, or radial seal

4

connectors, were introduced.  Montena Decl. (Dkt. No. 34-1) ¶ 7.  Among

the advantages of such compression-type connectors was that they

provided for a water-tight, 360° seal.  *Id.*  There were disadvantages

associated with early compression-type connectors, however, in that many

involved more than one component and were therefore difficult to

manipulate, and often were not "universal", meaning that they were not

designed to fit onto cable ends of differing diameters.  *Id.*

In 1997, while working in his capacity for PPC, Montena conceived

of a new type of compression connector that was both universal and

provided for the benefit of a water-tight seal.  Montena Decl. (Dkt. No. 34-

1) ¶ 8.  Montena's invention, which is disclosed and claimed in the '194

and '940 patents, includes five principal elements, including 1) a tubular

post; 2) a nut or other means of attaching a connector to a video port; 3) a

cylindrical body member that on one end is attached to the tubular post

and on the other includes a cylindrical sleeve or other deformable portion;

4) a compression ring; and 5) a tapered wall or similar dimensioning in the

compression ring that, when the compressing ring is slid axially over the

cylindrical body member, deforms part of the cylindrical sleeve inwardly

against the jacket of the coaxial cable.  *Id.*  One of the predominant,

innovative features of Montena's invention is the use of a compression

ring, also called a fastener member, that is dimensioned such that when

the cable and connector are joined the compression ring deforms the body

member of the connector inwardly against the cable jacket.  This action

serves two purposes, creating a mechanical engagement with the cable

and forming a water tight seal.

    An example of Montena's invention is included in the following

drawing, which depicts a longitudinal cross-sectional view of the preferred

embodiment of the invention disclosed in the '194 patent:



*Fig. 1*

'194 Patent, Fig. 1.  That figure shows a connector **10** ready for placement

on the prepared end of a cable **12**.   The cable includes an electrical

center conductor **14** surrounded by a braid conductor or conductive

grounding sheath **16** by a foil **18** and an insulator core or dielectric **20**.  A

dielectric covering or sheathing jacket **22** surrounds the braid and

comprises the outermost layer of the cable.

Turning to the connector **10**, it is dimensioned to accommodate

receiving the prepared end of the coaxial cable, and consists of a first

body member that includes a connector body or cylindrical body member

**24** and a post member **26**.  The connector **10** also has a second body

member, or a fastener member **28**.  The post **26** typically is a tubular

member having a first opening at the first end **30** and a second opening at

the second end **32**.  The post or a tubular post **26** defines the first inner

cavity **34**.  The first outer cavity or first central bore **36** is open at a first

end of the cylindrical body member **24** and is closed at the other end or

second end of the connector body or cylindrical body member **24** together

with the post member **26.**

In the preferred embodiment the connector body **24** and the post

member **26** are typically separate components, with the connector body

7

**24** being press fitted into the outer surface of the post member **26**. The connector body **24** is preferably formed of brass or a copper alloy, and the post member is composed of brass, although in an alternative preferred embodiment the connector body **24** and post member **26** can be formed integrally as a single piece, and the connector body **24** can be fabricated of a plastic composition.

The focus of plaintiff's infringement claims in this action are two product lines offered by Corning Gilbert. The first product, the UltraRange connector, was developed in or about 2004 in an effort to design around the '194 Patent following a jury verdict in Wisconsin in favor of PPC and against Corning Gilbert, finding infringement with regard to Corning Gilbert's earlier UltraSeal connectors. The second accused device, the UltraShield, was introduced in 2010 and operates much in the same way as the UltraRange connector in terms of the manner in which it forms a seal with a cable end. The UltraRange and UltraShield connectors differ from PPC connectors manufactured under the '194 and '940 Patents in the manner in which a water tight seal is accomplished between connector and cable. Unlike the PPC connector, the UltraRange and UltraShield products do not include bodies that deform. Instead, a plastic gripper is

utilized to slide under the connector body and secure the cable, also serving to seal the connector.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on July 5, 2011.  Dkt. No. 1.  Issue was thereafter joined by the filing of an answer on behalf of Corning Gilbert on September 6, 2011, generally denying the material allegations set forth in plaintiff's complaint and, *inter alia*, containing defenses and counterclaims asserting non-infringement, invalidity, and unenforceability of the patents in suit.  Dkt. No. 6.

An early summary judgment motion by Corning Gilbert on the issue of non-infringement was denied by the court as premature.  *See* Dkt. Nos. 19, 21, 22, and text order dated 11/18/11.  Since then, as a precursor to adjudication of the various infringement claims and defenses raised in the action, the parties have requested the court's guidance in defining certain disputed terms contained within the claims of the two patents in suit, including the following:

| Term | Patent |
|------|--------|
| Cylindrical Body Member | '194 |
| First End | '194 and '940 |

9

| | |
|---|---|
| Cylindrical Sleeve | '194 |
| First Central Bore | '194 and '940 |
| Compression Ring | '194 and '940 |
| Central Passageway | '194 and '940 |
| Commensurate | '194 |
| Said Inwardly Tapered Annular Wall Causing Said Rear End Portion of Said Cylindrical Sleeve to be Deformed Inwardly | '194 |
| Connector Body Member | '940 |
| Fastener Member | '940 |

The parties have submitted extensive briefing and materials regarding these claim terms, *see* Dkt. Nos. 34, 36, 38, and 39, and a claim construction hearing was held by the court on April 25, 2012.

III.    DISCUSSION

    A.    Claim Construction: The Legal Framework

Patent claim construction represents an issue of law to be decided by the court.  *Aventis Pharma S.A. v. Hospira, Inc.,* 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. V. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).  The guiding principles associated with patent claim construction are well-established and not particularly controversial.

Perhaps the most comprehensive discourse to date regarding the claim construction calculus is found in the Federal Circuit's en banc decision in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170, 126 S. Ct. 1332 (2006).  In *Phillips,* though with considerable elucidative discussion regarding the relative importance of intrinsic and extrinsic evidence, the Federal Circuit in essence endorsed its earlier decision in *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996), previously regarded by the courts and patent practitioners as defining the contours of the claim construction inquiry*. Phillips,* 415 F.3d at 1324.  The principal teaching of *Phillips* – and not a significant departure from earlier claim construction jurisprudence – is that claim terms should generally be given an ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention when read in the context of the specification and prosecution history.[2]  *Phillips*, 415 F.3d at 1313; *Thorner v. Sony Computer Entm't Am.*

---

[2]     PPC proposes that a person of ordinary skill in the art in this case should be defined as having at least a bachelor's degree in engineering and several years of experience in the cable and telecommunications industry relating to the design, manufacture, or utilization of coaxial cable connectors in communications systems. Corning Gilbert is generally in agreement with this definition, although it posits that many years of experience in the cable and telecommunications industry could serve as a substitute for the formal education component of the definition.  Both parties agree, in any event, that claim construction in this case will not turn on the definition of a person of ordinary skill in the art.

*LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Aventis Pharma S.A.,* 675 F.3d at 1329; *see also CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.") (citations omitted).

There are two exceptions to this general rule.  The first involves cases in which the patentee has acted as his or her own lexicographer, specifying a particularized definition to be attributed to a claim term.  *See Thorner*, 669 F.3d at 1365; *Phillips,* 415 F.3d at 1316; *Vitronics Corp.,* 90 F.3d at 1580.  To act as his or her own lexicographer a patentee must clearly and unequivocally manifest an intention to define a term differently than the plain and ordinary meaning which would otherwise obtain. *Aventis Pharma S.A.,* 675 F.3d at 1350; *Thorner,* 669 F.3d at 1365.

Under the second exception, a claim term may also properly be given a meaning which is different and more restrictive than its customary meaning when a patentee has made it clear, either through the patent's specification or during patent prosecution, that the invention does not include a full range of a particular term, and he or she has thereby

_____

disavowed the full scope of a claim's scope.  *Thorner,* 669 F.3d at 1366;

*Aventis Pharma S.A.,* 675 F.3d at 1330; *see also SciMed Life Sys., Inc. v.*

*Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir.

2001).  As is the case with regard to a patentee acting as a lexicographer,

this exception to the otherwise general rule that patent terms should be

given their ordinary meaning is both narrow and exacting; "[t]o constitute

disclaimer, there must be a clear and unmistakable disclaimer."  *Thorner*,

669 F.3d at 1366-67.

     While the words of a patent claim will generally control, they should

not be interpreted in isolation, in derogation of other portions of the patent;

instead "the person of ordinary skill in the art is deemed to read the claim

term not only in the context of the particular claim in which the disputed

term appears, but in the context of the entire patent, including the

specification."  *Phillips,* 415 F.3d at 1313.  In this regard, a patent

specification, which some liken to an internal dictionary, must be carefully

reviewed to determine whether, for example, the inventor has used a

particular term in a manner inconsistent with its ordinary meaning.  *Id.* at

1313-14; *see also Vitronics,* 90 F.3d at 1582 (citing *Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 979 (1995))*.*

A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics,* 90 F.3d at 1582.  When resorting to a patent's specification for guidance with respect to disputed claim terms one must consider it as a whole, and all portions should be read in a manner that renders the patent internally consistent.  *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).  "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims[,]" *Sjolund v. Musland,* 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original), "[n]or should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment." *Cornell Univ. v. Hewlett-Packard Co.,* 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, C.J.) (citing, *inter alia*, *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the claim terms themselves and the patent's specification, a third category of relevant intrinsic evidence worthy of consideration is the history surrounding prosecution of the patent.  That history, which is customarily though not always offered to assist a court in

fulfilling its claim construction responsibilities, is generally comprised of

the complete record of proceedings before the PTO including,

significantly, any express representations made by the applicant regarding

the intended scope of the claims being made, and an examination of the

prior art.  *Vitronics*, 90 F.3d at 1582-83.  Such evidence, which typically

chronicles the dialogue between the inventor and the PTO leading up to

the issuance of a patent and thus can act as a reliable indicator of any

limitations or concessions on the part of the applicant, oftentimes proves

highly instructive on the issue of claim construction.  *Philips*, 415 F.3d at

1313 ("We cannot look at the ordinary meaning of the term . . . in a

vacuum.  Rather, we must look at the ordinary meaning in the context of

the written description and the prosecution history.") (quoting *Medrad, Inc.

v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005)).

      B.    <u>Construction of Disputed Terms</u>

           1.   <u>The Patent Claims</u>

Claims 1 and 2 of the '194 and '940 patents, which are nearly

identical, serve as a useful backdrop for the court's claim construction

analysis.  Claim 1 of the '194 patent discloses the following:

> 1. A connector for coupling an end of a coaxial cable to a
> threaded port, the coaxial cable having a center conductor

surrounded by a dielectric, the dielectric being surrounded by a conductive grounding sheath, and the conductive grounding sheath being surrounded by a protective outer jacket, said connector comprising:

    a. a tubular post having a first end adapted to be inserted into an exposed end of the coaxial cable around the dielectric thereof and under the conductive grounding sheath thereof, said tubular post having an opposing second end;

    b. a nut having a first end for rotatably engaging the second end of said tubular post and having an opposing second end with an internally threaded bore for threadedly engaging the threaded port;

    c. a cylindrical body member having a first end and a second end, the first end of said cylindrical body member including a cylindrical sleeve having an outer wall of a first diameter and an inner wall, the inner wall bounding a first central bore extending about said tubular post, the second end of said cylindrical body member engaging said tubular post proximate the second end thereof, said cylindrical sleeve having an open rear end portion for receiving the outer jacket of the coaxial cable, said open rear end portion being deformable;

    d. a compression ring having first and second opposing ends and having a central passageway extending there-through between the first and second ends thereof, the first end of said compression ring having a first [non-tapered (claim 1)/constant diameter (claim 2)] internal bore of a diameter commensurate with the first diameter of the outer wall of said

16

cylindrical sleeve for allowing the first end of
said compression ring to extend over the first
end of said cylindrical body member, the central
passageway of said compression ring including
an inwardly tapered annular wall leading from
the first internal bore and narrowing to a
reduced diameter as compared with the first
diameter; and

e. said inwardly tapered annular wall causing said
rear end portion of said cylindrical sleeve to be
deformed inwardly toward said tubular post and
against the jacket of the coaxial cable as said
compression ring is advanced axially over the
cylindrical body member toward the second end
of said cylindrical body member.

'194 Patent 13:21-14:8.  Claim 1 of the '940 Patent reads as follows:

1. A connector for coupling an end of a coaxial
cable to a threaded port, the coaxial cable having a
center conductor surrounded by a dielectric, the
dielectric being surrounded by a protective outer
jacket, said connector comprising:

a. a post having a first end adapted to be
inserted into an end of the coaxial cable
around the dielectric and under the protective
outer jacket thereof, said post having an
opposing second end;

b. a connector body having a first end and a
second end, the first end of said connector
body having an outer wall and an inner wall,
the second end of said connector body
operatively attached to said post, the inner
wall bounding a first central bore extending
about said post for receiving the coaxial

17

cable within the first central bore, said first
end of said connector body member being
deformable; and

c. a fastener member having a first end and
a second opposing end with a central
passageway defined between the fastener
member first end and the fastener member
second end for allowing a portion of the
coaxial cable to pass there through, the
fastener member secured to the connector
body prior to installation over the end of the
coaxial cable in a pre-installed first
configuration, the central passageway being
dimensioned to compress the connector
body radially inwardly to decrease the
volume of the first central bore when the
fastener member is slidingly moved from the
first preinstalled configuration toward the
second end of the connector body, wherein
said fastener member causes said connector
body to be deformed inwardly toward said
post and against the protective outer jacket
of the coaxial cable as said fastener member
is advanced over the connector body toward
the second end of said connector body.

'940 Patent 13:36-14:02.

2. <u>Cylindrical Body Member/Connector Body Member</u>

The first, and seemingly the most significant, terms requiring

construction are two separate but related terms appearing in the two

patents in suit, "a cylindrical body member", as utilized in the '194 Patent,

and "a connector body member", as contained in the '940 Patent.  The

18

parties have offered the following proposed constructions of those terms:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|---|---|---|
| cylindrical body member<br><br>('194 Patent) | Structure of the connector that includes a cylindrical sleeve, and is engaged with a tubular post | The generally cylindrical shaped outer portion of the connector that surrounds the tubular post to define a central bore which is a single, unitary piece. |
| connector body/connector body member<br><br>('940 Patent) | Structure of the connector that is, in part, deformable, and is attached to a post | The outer portion of the connector that surrounds the tubular post to define a central bore.  In light of the specification, the connector body/cylindrical body member should be construed as a single, unitary piece. |

The chief battleground regarding these two terms involves the question of whether the specified member must be a single, unitary piece, as argued by Corning Gilbert, or instead can be comprised of more than one component, as PPC contends.[3]  Also at issue is whether the member is properly defined as constituting the "outer portion" of the connector, as Corning Gilbert maintains.

PPC argues that no fewer than three administrative determinations have been issued, all revealing that the cylindrical body member specified in the '194 patent need not be a single unitary piece, asserting that those

[3]    This distinction takes on critical significance in light of the fact that Corning Gilbert's accused connectors utilize two separate parts which, together, comprise the connectors' structure.

decisions are entitled to deference on the part of this court.  A review of

the first of those, an initial determination issued by United States

International Trade Commission ("ITC") Administrative Law Judge E.

James Gildea, dated October 13, 2009, fails to support that assertion.

*See* Nash Supplemental Decl. (Dkt. No. 38-1) Exh. L.  In point of fact, ALJ

Gildea's decision makes it clear that he did not define any claim terms of

the '194 patent in issue, and therefore offered no construction regarding

those terms.  *See id.* at p. 27.  It should be noted, moreover, that the

parties did not dispute the fact that the accused devices in that matter

infringed Claims 1 and 2 of the '194 Patent.  *See id.* at pp. 53-55.

The second administrative determination of relevance came in the

form of a letter decision issued by Charles R. Steuart, Chief of the

Intellectual Property Rights Branch for the U.S. Customs and Border

Protection, Department of Homeland Security, in which the argument now

being made by Corning Gilbert was rejected; that agency concluded that

the physical samples and diagrams provided by Corning Gilbert depicted

"a multi-body member that, in its totality, satisfies the cylindrical body

member element [of the '194 patent]". *See* Nash Decl. (Dkt. No. 34-2)

Exh. C at pp. 18.  That determination resulted in the issuance of a seizure

and forfeiture order aimed at the infringing coaxial cable connectors, which included Corning Gilbert's UltraShield and UltraRange connectors.[4] *Id.* at Exh. D.  The court has been advised, however, that on April 28, 2012, after the *Markman* hearing in this action, the U.S. Customs and Boarder Protection agency decided to reverse its position and to allow Corning Gilbert to import UltraRange and UltraShield connectors into the United States, resulting in a stay of those proceedings to allow the parties to enter into a stipulated agreement for importation of the connectors. *See* Letter, dated May 2, 2012, from Joseph P. Lavelle, Esq. (Dkt. No. 42).  Based upon this development and the ambiguity of those administrative decisions, I have chosen not to accord them deference and instead have engaged in my own *de novo* claim construction, utilizing the well-established principles articulated by the Federal Circuit in *Vitronics, Phillips,* and their progeny.

Based upon my independent review, I recommend that the court reject both parties' proposed definitions and that these terms need no

---

[4]      The third agency determination came from the ITC and addressed a connector sold by a non-party, Hanjiang Fei Yu Electronics Equipment Factory.  *See* Nash Supplemental Decl. (Dkt. No. 38-1) Exh. L.  That connector, like Corning Gilbert's UltraShield and UltraRange connectors, employed a cylindrical body member comprised of two pieces, in that instance a metal piece and a deformable braid plastic piece.  *See id.*

further construction.  The disputed terms are both comprised of three words each of which is of ordinary usage and fully capable of being understood by a person reading the patents at issue, including a jury adjudicating any infringement claims.  There is no indication in either of the two patents in suit that the patentee intended to serve as his own lexicographer and ascribe definitions to one or more of those words that would depart from ordinary usage.  Nor is there any evidence from the patent specification and prosecution history of disavowal of any portion of the full scope of the ordinary meaning attributable to those words.  As such, the terms should be given their ordinary and customary meaning. *Thorner,* 669 F.3d at 1365.

PPC would have the court import into this term the additional requirement that the structure representing the cylindrical body member described in the claims of the '194 Patent include a cylindrical sleeve which is engaged with a tubular post.  Similarly, with regard to the '940 Patent, it argues that a connector body member should include a structure that is in part deformable and is attached to a post.  Yet, those additional limitations garner no support from the available intrinsic evidence.  And, more importantly, those additional constraints echo limitations contained

elsewhere within the claims of those patents and would render those additional limitations redundant if imported into the definition of a cylindrical body member.

Corning Gilbert's proposed definition of these terms is equally, if not more, problematic.  Corning Gilbert's construction would require that the cylindrical body member surround the tubular post to define a central bore, again importing additional limitations that are not supported by the intrinsic evidence.  With respect to the '940 Patent, Corning Gilbert also would require that the connector body member comprise the "outer portion" of the connector.

Consideration of Figure 1 of the '940 Patent, depicting one of its preferred embodiments, is helpful to understanding Corning Gilbert's argument.



FIG. 1

'940 Patent Fig. 1.  As can be seen, while the connector body **24** is

engaged with the outside of the post member **26**, it is not necessarily true

that it is the outer- most portion of the connectors depicted.  Other

components, for example, such as the nut member **44**, also help define

outer boundaries of the connector depicted, and in Figure 1 appears to be

larger in diameter than the connector body member **24**.  Similar

conclusions can be drawn from reviewing Figures 5-7, 12, 14, and 19, all

of which show that the connector body member is not the outer most

portion of the connector depicted.

Corning Gilbert would also limit the terms "cylindrical body member"

and "connector body member" to require that the member constitute a

"single, unitary piece."  The Federal Circuit has had prior occasion to

address an issue similar to that now presented.  *See CCS Fitness, Inc. v.*

*Brunswick Corp.,* 288 F.3d 1359 (Fed. Cir. 2002).  *CSS Fitness* involved a

patent for a stationary exercise device, commonly referred to as an

elliptical trainer.  *Id.* at 1362.  At issue was construction of the claim

limitation "reciprocating member".  *Id.*  Construing that term, the district

court concluded that the term did not cover anything other than a single-

component comprising a straight bar, as depicted in the patent's

drawings.  *Id.*  In rejecting the district court's restrictive definition, the

Federal Circuit noted that the customary definition of a member can

include a structure that is not limited to a single component, and found no

basis to conclude that the patentee had intended to use the term in a

more restrictive manner than consistent with its ordinary usage.  *Id.* at

1367.

In support of its effort to limit these two terms in dispute to a single,

unitary piece, Corning Gilbert places heavy reliance upon the Federal

Circuit's decision in *Retractable Techs., Inc. v. Becton, Dickinson and Co.,*

653 F.3d 1296 (Fed. Cir. 2011).  At issue in that case were patents

disclosing a retractable medical syringe featuring a needle that retracts

into the syringe body following use in order to minimize the risk,

associated with residual contamination, of the user being accidently

pricked.  *Id.* at 1298.  Among the claim terms construed by the district

court in that case was "body", the trial court concluding that the term was

not limited to a single piece structure.  *Retractable Techs.*, 653 F.3d at

1304.  An appeal from that determination yielded a splintered decision by

the three-judge panel of the Federal Circuit hearing the case.  Circuit

Judge Lourie wrote that the term should be limited to a one piece

structure, relying heavily upon the patent specifications.   653 F.3d at

1305.  While acknowledging that the patent claims could be read to imply

that the body was not intended to be limited to one structure, Judge Lourie

concluded that "[the] implication is not a strong one." *Id.* at 1305.

Importantly, Judge Lourie noted that in distinguishing prior art syringes

comprised of multiple pieces, a summary of the invention associated with

one of the patents in suit disclosed that it "feature[d] a one piece hollow

body", noting that prior art had failed to recognize the possibility of

molding a retractable syringe as a one piece outer body.[5]  *Id.* at 1305.

Circuit Judge Plager concurred in the result in *Retractable*

*Technologies,* issuing a cautionary reminder that in the end, claim terms

must be interpreted in light of the specification of which they are a part,

and which describes the invention claimed.  653 F.3d at 1311.  Chief

Judge Rader, however, authored a strong dissent, focused upon the

court's construction of the term "body" to require a single piece structure,

finding no support for restricting the ordinary and customary meaning of

the term, as understood by a person of ordinary skill in the art at the time

---

[5]      One obvious potentially distinguishing feature of *Retractable Technologies* is the fact that the case involved construction of the term "body", rather than "body member".

of the invention.  *Id.* at 1311.

The admonition issued by Chief Judge Rader in *Retractable Technologies, Inc.* is particularly germaine in this case.  While it is undeniable that all of the embodiments contained within the two patents in suit depict the cylindrical body member ('194 Patent), and the connector body member ('940 Patent), as a single component, there is no strong indication from the specifications or prosecution histories associated with those two patents of any intention on the part of the patentee to narrow the scope of the claim term to be more restrictive than would otherwise prevail when applying the ordinary and customary meaning of the term "member".

Indeed, the specifications and embodiments of the two patents reflect the patentee's acknowledgment that a "member" can consist of separate components.  The '194 Patent, for example, discloses that "[t]he connector **10** has a first body member that includes connector body or cylindrical body member **24** and post member **26**."  '194 Patent 6:47-49. The patent goes on to state that "[p]referably, the connector body **24** and the post member **26** *are separate components*."  '194 Patent 6:63-64 (emphasis added).  This plainly reflects the inventor's understanding that

28

separate components can be used together to comprise a body member.

In sum, I am not persuaded that the court has been presented with the sort of compelling evidence required in order to overcome the strong presumption that the two terms now in dispute should be given their ordinary and customary meaning.  And, since the terms are simple and readily susceptible of construction by the factfinder in this case, I discern no need to provide further refinement as sought by the parties with respect to these two terms.

### 3. First End

The parties next request construction of the term "first end", and have offered the following counter-proposed interpretations:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
| --- | --- | --- |
| a first end<br><br>('194 Patent and '940 Patents) | No construction required. To the extent construction is required:<br><br>'194 Patent: A portion of the cylindrical body member that includes a cylindrical sleeve.<br><br>'940 Patent: A portion of the connector body member that is deformable and has an inner wall bounding a first central bore that extends about the post for receiving a coaxial cable. | The open end of connector body 24, shown on the right side of Figure 3 of the '194 Patent |

Like "cylindrical body member" and "connector body member", the

term "a first end" constitutes a simple term readily capable of being understood by both persons of ordinary skill in the art and factfinders addressing the claims and defenses in the case.  There is no ambiguity in the language, nor is there anything within the specification or prosecution history that reflects either that the patentee intended to act as his own lexicographer and attribute a different definition to that term, or that he disavowed the full scope the term in connection with his invention.

Corning Gilbert proposes to clarify the term by referring to a figure depicted in the '194 Patent.  This, however, represents an improper attempt to cabin the term utilizing one of several embodiments contained within the patent's specification.  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004)). The alternative definitions proposed by PPC fare no better, since they would import additional limitations not included in the term and not supported by any attempt by the patentee to act as his own lexicography or disavow the full range of the term.  I therefore recommend a finding that there exists no need to further construe this disputed term.

4. "Cylindrical Sleeve"

The next term in dispute is a "cylindrical sleeve", with the parties having offered the following proposed constructions:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|---|---|---|
| cylindrical sleeve<br><br>('194 Patent) | No construction required. To the extent construction is required:<br><br>A portion of the first end of the cylindrical body member that has an inner wall bounding a first central bore extending about the tubular post, and that has an open rear end portion for receiving the outer jacket of the coaxial cable that is deformable as the compression ring is slid axially over the cylindrical body member. | A cylindrical portion of the first end of the cylindrical body member, the rear end portion of which is deformed when the compression ring is advanced axially. |

The term "cylindrical sleeve" is both unambiguous and readily understood.  The term is comprised of two words both of which are susceptible of common understanding.  Dictionary definitions of the words include the following: "cylindrical" is defined as "of, relating to, or having the shape of a cylinder, especially a circular cylinder", THE AMERICAN HERITAGE DICTIONARY 453 (4th ed. 2000), and "relating to or having the form or properties of a cylinder", MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 288 (10th ed. 1999).  The definition of "sleeve" includes "[a] case into which an object or device fits: *a record sleeve*", THE AMERICAN

31

HERITAGE DICTIONARY 1635 (emphasis in original), and "a tubular part (as

a hollow axle or bushing) designed to fit over another part," MERRIAM

WEBSTER'S COLLEGIATE DICTIONARY 1103.

That the inventor intended to incorporate these common definitions

into his use of the term "cylindrical sleeve" is buttressed by consideration

of Claim 1 of the '194 Patent, which is representative of use of the term.

There, the cylindrical sleeve is described as being included within the first

end of the cylindrical body member, "having an outer wall of a first

diameter and an inner wall, the inner wall bounding the first central bore

extending about said tubular post, . . .".  '194 Patent 13:37-41.

Corning Gilbert proposes limiting the term and not according it the

full scope of its ordinary meaning based upon a portion of the patent

prosecution history in which the patentee's attorney identified for the

Patent and Trademark Office ("PTO") examiner where a cylindrical sleeve

could be found in one of the disclosed embodiments.  *See* Nash Supp.

Decl. (Dkt. No. 38-1) Exh. M.  This portion of the prosecution history,

however, does not support Corning Gilbert's claim of disavowal, instead

reflecting only that the attorney was merely pointing out for the examiner

where the cylindrical sleeve could be found in the embodiments disclosed,

prefacing the disclosure with the signal "*e.g.,*" which clearly reflects that it was merely intended to offer an example, and not to restrict the term beyond its ordinary usage.

Because this claim term is susceptible of being understood, and finding no persuasive evidence to reflect that the inventor intended a different usage, I recommend a finding that no further construction is necessary for this term.[6]  *Surgical Corp.*, 103 F.3d at 1568.

> 5.  <u>First Central Bore</u>

Another claim term in dispute is "first central bore".  The parties have offered the following counter-proposed definitions for this term:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|:---:|:---:|:---:|
| | | |

---

[6]     In its proposed construction of this term Corning Gilbert also would add "the rear end portion of which is deformed when the compression ring is advanced axially."  While it may be true that under the '194 Patent this could occur, there is no basis to incorporate that concept into the definition of cylindrical sleeve, and Corning Gilbert has offered none in its *Markman* briefing.

| a first central bore<br><br>('194 Patent and '940 Patents) | No construction required. To the extent construction is required:<br><br>'194 Patent: A bore that is bounded by an inner wall of the cylindrical sleeve and that extends about the tubular post.<br><br>'940 Patent: A bore that is bounded by an inner wall of the connector body and that extends about the post. | A cavity defined by the outer wall of the tubular post and the inner wall of the cylindrical body member |

Element (c) of Claims 1 and 2 of the '194 Patent describes

> a cylindrical body member having a first end and a second end, the first end of said cylindrical body member including a cylindrical sleeve having an outer wall of a first diameter and an inner wall, the inner wall bounding the first central bore extending about said tubular post. . .

'194 Patent 13:36-41, 14:25-30. The '940 Patent includes similar

language in element (b), requiring

> a connector body having a first end and a second end, the first end of said connector body having an outer wall and an inner wall, the second end of said connector body operatively attached to said post, the inner wall bounding a first central bore extending about said post for receiving the coaxial cable within the first central bore. . .

'940 Patent 13:44-50. According to the specifications of those patents,

the purpose of the first central bore is to house a portion of the cable braid

and cable jacket once the cable is inserted into the connector, permitting

34

the cable braid to make electrical contact with a tubular post in order to extend the braid's electromagnetic shield fully to the part to which the connector is attached.  *See, e.g.,* '194 Patent 6:58-62, 8:19-22.

This term is not particularly controversial.  While PPC argues that no construction is required, it has proposed a definition.  That definition is fairly similar to that offered by Corning Gilbert.

There does not appear to be any material disagreement that the first central bore essentially represents a cavity lying between the inner wall of the cylindrical sleeve and outer portion of the tubular post.  I therefore recommend a finding that the term means "a cavity lying between the inner wall of the cylindrical sleeve ('194 Patent) or connector body ('940 Patent) and the tubular post ('194 Patent) or the post ('940 Patent)."

### 6.  <u>"A Compression Ring" and "A Fastener Member"</u>

The parties next request construction of two related terms, "a compression ring" as contained within the '194 Patent, and "a fastener member", included within the claims of the '940 Patent.  Those terms, though somewhat different, describe the same general feature, with the parties having offered the following proposed constructions:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|---|---|---|
| a compression ring<br><br>('194 Patent) | No construction required. To the extent construction is required:<br><br>Structure of the connector that deforms the rear end portion of the cylindrical sleeve inwardly toward the tubular post when slid axially over the cylindrical body member. | A body member, distinct from the cylindrical body member, which contains an inwardly tapered annular wall that compresses the cylindrical sleeve when the compression ring is moved axially over the cylindrical body member. |
| Claim Term | PPC's Construction | Corning Gilbert's Construction |
| a fastener member<br><br>('940 Patent) | Structure of the connector that deforms the connector body member inwardly toward the post when slid over the connector body member. | A body member, distinct from the cylindrical body member, which contains an inwardly tapered annular wall that compresses the cylindrical sleeve when the compression ring is moved axially over the cylindrical body member |

Both parties agree that these two terms are used synonymously to refer to the portion of the patented connecter that, when slid over the cylindrical or connector body member, causes deformation of the cylindrical sleeve, in the case of a '194 Patent, or the first end of the connector body member with respect to the '940 Patent, inwardly toward the post and against the cable jacket, thereby forming the desired seal. *See, e.g.,* '194 Patent 7:31-63; '940 Patent 7:31-7:63.

Once again, Corning Gilbert unnecessarily imports language found elsewhere in the patent claims into its proposed definitions.  For example, while Corning Gilbert argues that the compression ring of the '194 Patent

36

must contain an inwardly tapered annular wall, element (d) of Claim 1 of the patent provides for a compression ring "including an inwardly tapered annular wall. . .",  rendering the language proposed by Corning Gilbert redundant for purposes of that claim.  *See* '194 Patent 13:55-57.  There is no support  for importing this limitation into the term "compression ring."  And, as PPC notes, in element (d) of the '194 Patent and element (c) of the '940 Patent it is the central passageway of the compression ring that includes the inwardly tapered annular wall, although the '940 Patent goes on to specify that it contains a central passageway that is dimensioned to compress the connector body radially inward causing the desired deformation toward the post and against the outer jacket of the coaxial cable in order to effectuate the requisite seal.  *See* '940 Patent 13:52-14:2.

It should also be noted that the '940 Patent describes a fastener member that does not necessarily require an inwardly tapered annular wall.  No indication appears in the specification for the '940 Patent that would limit the manner which the desired compression is accomplished to inwardly tapered annular walls, as distinct with other dimensioning which

37

could serve the same purpose.[7]

Having considered the parties' counterproposed definitions, I recommend that the term "a compression ring" as utilized in the '194 Patent, be defined as the "structure of a connector that deforms the rear end portion of the cylindrical sleeve inwardly toward the tubular post when slid axially over the cylindrical body member."  I also recommend that a "fastener member" be defined, for purposes of the '940 Patent, as "the structure of the connector that deforms the connector body member inwardly toward the post when slid over the connector body member."

      7. <u>"Commensurate"</u>

The parties next request construction of the unassuming term "commensurate", which appears only in the '194 Patent.  The parties have proposed the following definitions for this term:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|---|---|---|
| commensurate<br><br>('194 Patent) | Of corresponding extent, magnitude, or degree; proportionate, adequate. | Of corresponding extent, magnitude, or degree; proportionate. |

To place the parties' disagreement over this term in context, I note

---

[7]     I note that the '940 Patent claims a connector body member and not a cylindrical body member.  Yet the proposed Corning Gilbert construction for the term "fastener member" references a cylindrical body member.

that two of the claims of the '194 Patent disclose a first end of the compression ring with a first non-tapered internal bore "of a diameter commensurate with the first diameter of the outer wall of said cylindrical sleeve". '194 Patent, 13:50-53, 14:39-42. During prosecution of the '194 Patent the inventor explained to the PTO examiner that "[t]he first end **56** of the compression ring **28** has a first internal bore **62** of a diameter commensurate with the first predetermined diameter (Fig. 3, 'd') of the outer wall of the cylindrical sleeve," therefore signaling an intent to disclose a relationship between the diameter of the first internal bore and the diameter of the outer wall of the cylindrical sleeve. *See* Stein Decl. (Dkt. No. 36-1) Exh. 4 (9/11/00 Preliminary Amendment) at p. 12.

This term was construed, in the context of the '194 Patent, during prior litigation between those same parties. *See John Mezzalingua Assoc., Inc., v. Corning Gilbert, Inc.*, Civil Action No. 03-CV-354-S (W.D.Wis.); *see also* Nash Decl. (Dkt. No. 34-2) Exh. J. The parties disagree over whether the construction of District Judge Shabaz in that case of the term "commensurate" included the word "adequate", a term which PPC argues should be contained within this court's construction. In his decision, Judge Shabaz plainly settled on the second of the two

39

common dictionary definitions of the term "commensurate", defining it to mean "[o]f corresponding extent, magnitude, or degree; proportionate, adequate."  *See id.* at pp. 5-6.

While tending to agree with Corning Gilbert that term "adequate" does not seem to capture the intended meaning, I feel compelled to recommend that this court follow that definition.  Since the Wisconsin action involved the same parties and patent, the court's decision in that action would appear to merit preclusive effect.[8]  *See Taylor v. Sturgell*, 553 U.S. 880, 128 S. Ct. 2161 (2008).

Moreover, even if that action involved an accused infringer other than Corning Gilbert, but the same patent, *stare decisis*, which teaches that determinations involving the same legal question presented under

_____

[8]     Two doctrines encompassed within the principle of "*res judicata*", claim preclusion and issue preclusion, *Taylor*, 553 U.S. at 892, 128 S. Ct. at 2171, protect against "the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions" while precluding parties from bringing claims they have already had a full and fair opportunity to litigate. *Montana v. United States*, 440 U.S. 147, 153-54, 99 S. Ct. 970, 973-74 (1979). *Res judicata*, or "claim preclusion generally prevents litigation of any ground that could have been advanced in the earlier suit in support of the claim… made there…". *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 508 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S. Ct. 2455 (1983).  Issue preclusion, a more narrow doctrine often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party or its privy. *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007).

similar circumstances should not ordinarily be reconsidered, absent

manifest unfairness, would seemingly dictate that Judge Shabaz's

construction control.  *See Texas Instruments, Inc. v. Linear Techs. Corp.,*

182 F. Supp. 2d 580, 589 (E.D. Tex. 2002).  Indeed, *stare decisis* plays an

important role the patent claim construction calculus, given the

"importance of uniformity in the treatment of a given patent."  *Markman*,

517 U.S. at 390, 116 S. Ct. at 1396.  As one of the reasons offered in

support of its decision to relegate claim construction to the courts, as a

matter of law, in *Markman* the Supreme Court observed that the policy of

uniformity would be furthered by its prescribed approach, noting that

"treating interpretive issues as purely legal will promote (though it will not

guarantee) intrajurisdictional certainty through the application of *stare*

*decisis* on those questions not yet subject to interjurisdictional uniformity

under the authority of the single appeals court."  *Id.* at 391, 116 S. Ct. at

1396.

Accordingly, I recommend that the term "commensurate" be defined

to mean:  "of corresponding extent, magnitude, or degree; proportionate,

adequate."

### 8.  A Central Passageway

A term common to both the '194 and '940 Patents for which the parties now request guidance is "a central passageway".  The parties offer the following proposed definitions for that term.

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
|---|---|---|
| a central passageway<br><br>('194 and '940 Patent) | No construction required. To the extent construction is required:<br><br>'194 Patent: A passageway extending between the first and second ends of the compression ring.<br><br>'940 Patent: A passageway defined between the first and second ends of the fastener member. | A cavity in the connector defined by the inner portion of the compression ring/fastener member. |
|  |  |  |

The term "a central passageway" is found in the portions of claims 1 and 2 of the '194 Patent and Claim 1 of the '940 Patent describing the compression ring or fastener member, terms used synonymously in the two patents.  *See* '194 Patent 13:48-58 and 14:37-49; '940 Patent 13:52-14:2.  The central passageway at issue is perhaps best depicted in Figure 4 of the '194 Patent, as follows:



*Fig. 4*

'194 Patent, Figure 4 shows the fastener member or compression ring

described in '194 Patent, **28** with a first opening **56** and a second opening

**58** defining a second cavity, or a central passageway **60** between the two

ends.  '194 Patent 7:34-7:40.  A similar passageway is reflected in the

'940 Patent on the inside of the fastener member.  *See* '940 Patent 7:31-

7:61.

43

The term central passageway does not appear to be controversial and should be readily susceptible of interpretation by a jury.  The purpose of the passageway, which is tapered in various of the embodiments reflected, is to perform, through the use of tapered dimensions, the deforming process resulting in the desired seal.  In order to provide clarity, however, I recommend that the term be interpreted as "a cavity in the center of the compression ring ('194 Patent) or fastener member ('940 Patent) extending between the first and second ends thereof."

        9. <u>"Said Inwardly Tapered Annular Wall Causing Said Rear End Portion of Said Cylindrical Sleeve to be Deformed Inwardly"</u>

Element (e) of Claims 1 and 2 of the '194 Patent describes an

> inwardly tapered annular wall causing said rear end portion of said cylindrical sleeve to be deformed inwardly toward said tubular post and against the jacket of the coaxial cable as said compression ring is advanced axially over the cylindrical body member toward the second end of said cylindrical body member.

'194 Patent 14:1-8, 14:51-57.  The parties have requested construction of this claim term, and offer the following proposed definitions:

| Claim Term | PPC's Construction | Corning Gilbert's Construction |
| --- | --- | --- |

44

| said inwardly tapered annular wall causing said rear end portion of said cylindrical sleeve to be deformed inwardly<br><br>('194 Patent) | No construction required. To the extent construction is required:<br><br>An inwardly tapered wall in the compression ring that causes the rear end portion of the cylindrical sleeve to deform inwardly toward the tubular post when the compression ring is slid axially over the cylindrical body member. | As the inwardly tapered annular wall advances axially over the cylindrical sleeve, the cylindrical sleeve is deformed inwardly in a uniform fashion commensurate with the inward taper in the wall of the compression ring. |
|---|---|---|

Like several others in dispute, this claim term consists of commonly understood words, describing the action of the deformation that occurs through movement of the compression ring onto the connector's cylindrical body member, based upon the tapering of its annular wall.  As such, it does not appear to require further refinement.

Corning Gilbert offers a construction of this claim term which is flawed in at least two respects.  First, without any support from the patent specification or prosecution history, Corning Gilbert interjects the requirement that the deformation occur "in a uniform fashion commensurate with the inward taper of the wall of the compression ring".  While it may be entirely true that it is the inward taper of the compression wall that causes deformation, nowhere is it specified that the deformation must occur uniformly.  Secondly, the Corning Gilbert construction states that the deformation occurs as the inwardly tapered annular wall advances

45

axially over the cylindrical sleeve.  The express terms of the claims

containing the disputed term, however, provide that deformation occurs as

the compression ring is advanced axially over the cylindrical *body*

*member*, and not the cylindrical *sleeve* as propounded by Corning Gilbert.

While Corning Gilbert contends that there is no support from the intrinsic

evidence that the claims cover irregular deformation, proper focus should

be upon whether the intrinsic evidences reflects an intent on the part of

the inventor to surrender the full scope of the claim and eschew an

intention to protect his invention where irregular deformation occurs.[9]

IV.   <u>SUMMARY AND RECOMMENDATION</u>

The two patents in suit involve relatively simple concepts, products,

and methods described in terms most of which are readily understandable

without the need for technical or expert assistance or further refinement.

The efforts on the part of the parties to entice the court into limiting those

terms, including by incorporating limitations found elsewhere in the patent

claims, unavailing, given the absence of any indication that the patentee

intended to act as his own lexicographer and to disavow the full scope of

---

[9]       One could perhaps argue that an irregular deformation could potentially undermine 360° seal touted in the '194 and '940 patents as one of the major features of the connectors disclosed.   It is conceivable, however, that the deformation could occur in an irregular fashion, yet in the end produce a regular, airtight seal.

the ordinary meanings of those terms.  Having carefully considered the

patents in suit, the arguments of the parties, and the relevant and

available intrinsic evidence, and other data informing the court's analysis,

it is hereby respectfully

     RECOMMENDED that the court affix the following meanings to the

patent claim terms in dispute:

| Disputed Term | Proposed Construction |
|---|---|
| Cylindrical Body Member | No Construction Necessary |
| First End | No Construction Necessary |
| Cylindrical Sleeve | No Construction Necessary |
| First Central Bore | "A cavity lying between the inner wall of the cylindrical sleeve ('194 Patent) or connector body ('940 Patent) and the tubular post ('194 Patent) or the post ('940 Patent)" |
| Compression Ring | "structure of a connector that deforms the rear end portion of the cylindrical sleeve inwardly toward the tubular post when slid axially over the cylindrical body member" |
| Central Passageway | "a cavity in the center of the compression ring ('194 Patent) or fastener member ('940 Patent) extending between the first and |

47

| | |
|---|---|
| | second ends thereof." |
| Commensurate | mean "of corresponding extent, magnitude, or degree; proportionate, adequate." |
| Said Inwardly Tapered Annular Wall Causing Said Rear End Portion of Said Cylindrical Sleeve to be Deformed Inwardly | No Construction Necessary |
| Connector Body Member | No Construction Necessary |
| Fastener Member | "the structure of the connector that deforms the connector body member inwardly toward the post when slid over the connector body member" |

David E. Peebles
U.S. Magistrate Judge

Dated:      September 5, 2012
             Syracuse, NY