**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**PPC BROADBAND, INC.,**

                **Plaintiff,**

        **v.**

**CORNING OPTICAL**
**COMMUNICATIONS RF, LLC,**

              **Defendant.**

**5:11-cv-761**
**(GLS/DEP)**

_____

**APPEARANCES:**

**FOR THE PLAINTIFF:**
Barclay Damon LLP
One International Place
14th Floor
Boston, MA 02110

80 State Street
Albany, NY 12207

Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

**FOR THE DEFENDANT:**
Orrick, Herrington Law Firm
51 West 52nd Street
New York, NY 10019

1152 15th Street NW

**OF COUNSEL:**

JOHN T. GUTKOSKI, ESQ.

BELLA S. SATRA, ESQ.

DOUGLAS J. NASH, ESQ.
GABRIEL M. NUGENT, ESQ.
JOHN D. COOK, ESQ.
KATHRYN DALEY CORNISH,
ESQ.
MARK E. GALVEZ, ESQ.

ANDREW D. SILVERMAN, ESQ.
DANIEL A. RUBENS, ESQ.

MARK S. DAVIES, ESQ.

Washington, DC 2005-1706

DLA Piper LLP                        KATHRYN R. GRASSO, ESQ.
500 Eighth Street NW                 STEPHEN J. GOMBITA, ESQ.
Washington, DC 20004                 JOSEPH P. LAVELLE, ESQ.
                                     ANDREW N. STEIN, ESQ.


401 B Street                         SUSAN N. ACQUISTA, ESQ.
Suite 1700
San Diego, CA 92101-4297


Harter, Secrest Law Firm             JERAULD E. BRYDGES, ESQ.
1600 Bausch & Lomb Place             ERIKA N.D. STANAT, ESQ.
Rochester, NY 14604-2711

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I.  Introduction

Plaintiff PPC Broadband, Inc. commenced this action against

defendant Corning Optical Communications RF, LLC alleging that

Corning's UltraRange and UltraShield series coaxial cable connectors

willfully infringed its U.S. Patent No. 6,558,194 ("194 Patent") and U.S.

Patent No. 6,848,940 ("940 Patent").  (*See generally* Compl., Dkt. No. 1.)

After a three-day trial, the jury found in favor of PPC.  (Dkt. No. 358.)

Subsequently, the court held a two-day bench trial on Corning's laches and

equitable estoppel affirmative defenses.  (Dkt. Nos. 513-14.)  In addition to Corning's defenses, pending before the court are PPC's motions for enhanced damages and attorneys' fees, and prejudgment interest.  (Dkt. Nos. 409, 412.)  For the reasons that follow, the court finds that Corning has not proven either affirmative defense and grants in part and denies in part both of PPC's motions.

## II. <u>Background</u>

After conducting a non-jury trial on Corning's affirmative defenses, considering the parties' post-trial submissions, evaluating the credible evidence, and drawing reasonable inferences, the court makes the following findings of fact.[1]  *See* Fed. R. Civ. P. 52(a); (Dkt. Nos. 517-18, 520-21.)

Corning was previously found to infringe on PPC's patents. Specifically, a 2003 Wisconsin litigation determined that certain Corning UltraSeal connectors infringed on PPC's 194 Patent.  (Dkt. No. 513 at 46.)

---

[1]  The record includes the testimony from both the jury and non-jury trials, the deposition designations, all admitted exhibits, and the parties' stipulation.  (Dkt. Nos. 307, 359-65, 511, 513-14.)  The court admits all exhibits presented at the bench trial except for D-1257, an exhibit for which an objection was previously sustained at trial, and pages twenty-seven through twenty-nine of exhibit D-1259, pages of which the parties concur as to admissibility. (Dkt. No. 349; Dkt. No. 513 at 101-02; Dkt. No. 519.)  Additionally, in general, the court concurs with the facts as recited by PPC.  (Dkt. Nos. 517-18.)

Following that litigation, Corning and PPC entered into a settlement agreement related to other, noninfringing connectors. (Ex. D-1043.) The agreement provided that PPC would not sue Corning over its UltraSeal 7, 11, and certain connectors with "substantially similar structure" for infringement of the 194 Patent among others. (Ex. D-1043 ¶ 10, 23; Dkt. No. 511, Attach. 4 at 7.) As part of the settlement agreement, the parties drafted talking points that they could communicate to their customers and one point expressly stated that Corning could continue to sell its UltraSeal 7 and 11 products. (Ex. D-1043 at 15; Dkt. No. 511, Attach. 4 at 7.)

In 2004, following the settlement agreement, Corning developed a new product called the UltraRange. (Dkt. No. 362 at 53-55.) Donald Burris, Corning's lead engineer, testified that he based the design of the UltraRange on noninfringing products from the UltraSeal line. (*Id.* at 54-55; Dkt. No. 513 at 14-16.) Specifically, Burris relied on the UltraSeal 7, 11, and 59-HEC products to develop the UltraRange. (Dkt. No. 362 at 54-55; Dkt. No. 513 at 14-16; Ex. D-1234 at 2-3.) In December 2004, PPC obtained Corning's UltraRange product, analyzed it for infringement, and determined that it did not infringe the 194 Patent. (Dkt. No. 307 at 3.)

Thereafter, in 2005, Corning received customer complaints about the

UltraRange and added two features to the product: an extension of the front end of the gripper and a second taper to the rear of the compression ring.  (Dkt. No. 362 at 62-63, 67-69; Dkt. No. 513 at 18.)  Corning's design was patented in 2006, which showed the two tapers.  (Dkt. No. 513 at 22-24.)  The jury in this case found that this newly designed 2005 version of the UltraRange infringed PPC's 194 and 940 Patents.  (Dkt. No. 358.)

Burris designed the 2005 version of the UltraRange and explained that its new features were "invisible" because they were "inside the connector and would [not] be noticeable."  (Dkt. No. 362 at 103-04.)  Notably, the 2005 version of the UltraRange worked differently than the 2004 version and the UltraSeal 7, 11, and 59-HEC products.  (Dkt. No. 511, Attach. 4 at 20; Dkt. No. 513 at 34-43.)  Nevertheless, Corning kept the same series and model number, same outward appearance, and same catalogue and marketing materials for the 2005 version of the UltraRange as the 2004 version of the UltraRange.  (Dkt. No. 359 at 118-20; Dkt. No. 360 at 22-23, 84-86; Dkt. No. 362 at 16-17.)  Corning never sent PPC samples or drawings of the 2005 version of the UltraRange. (Dkt. No. 362 at 21-22.)  Corning presented the 2005 redesigned version of the UltraRange at trade shows, depicted it in a 2009 video, and presented

it on a poster created in 2008.  (Dkt. No. 363 at 82-85, 106; Dkt. No. 513 at 24-25.)

PPC officials were not aware that Corning had redesigned the UltraRange until 2011.  (Dkt. No. 359 at 117-19; Dkt. No. 360 at 10-11, 22-24, 54-55, 85-86.)  In 2010, Corning expanded its product line to add the UltraShield coaxial cable connectors and first shipped this product to a customer in January 2011.  (Dkt. No. 307 at 2.)  PPC officials first became aware that the UltraRange changed after it tested Corning's UltraShield product for infringement in 2011.  (Dkt. No. 359 at 114-17; Dkt. No. 360 at 90.)  Thereafter, it accused the 2005 version of the UltraRange and the UltraShield of patent infringement of the 194 and 940 Patents in July 2011. (Compl.; Dkt. No. 307 at 2.)

PPC was known to aggressively protect its intellectual property by, among other things, actively enforcing its patents.  (Dkt. No. 511, Attach. 4 at 16, 18.)  For example, Corning expected that PPC would, at a minimum, contact them about potential infringement if PPC knew that Corning had incorporated its infringing UltraSeal product into a new product.  (*Id.* at 17-18.)  Additionally, PPC monitored its competitors.  It obtained samples of its competitors' products including Corning's UltraRange product.  (Dkt.

No. 359 at 117-18.)  PPC also tested Corning's UltraRange and UltraShield products for performance in 2005, 2009, and 2011 through red dye testing.  (Dkt. No. 307 at 3; Dkt. No. 359 at 118; Dkt. No. 513 at 123-24.)

## III.  Discussion

### A.  Laches and Equitable Estoppel

At the September 2016 non-jury trial, Corning supplemented the record from the July 2015 jury trial advancing the affirmative defenses of laches and equitable estoppel.  Based on the court's factual findings from the entire record, it makes the following conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).

To prove laches, the infringer must demonstrate by a preponderance of the evidence that (1) "the patentee's delay in bringing suit [was] 'unreasonable and inexcusable,'" and (2) the infringer suffered "'material prejudice attributable to the delay.'"  *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297 (Fed. Cir. 2004) (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992), *overruled on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 807 F.3d 1311 (Fed Cir. 2015)); *see A.C. Aukerman Co.*, 960 F.2d at

7

1045. A court will presume laches if the patentee delays filing suit for more than six years after it knew or should have known of the potential infringement. *See A.C. Aukerman Co.*, 960 F.2d at 1028. A patentee has constructive knowledge if the infringer engaged in "pervasive, open, and notorious activities that a reasonable pantentee would suspect were infringing." *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998) (internal quotation marks and citation omitted).

To establish equitable estoppel, the infringer must demonstrate three elements:

> "(1) the patentee, through misleading conduct, leads the . . . infringer to reasonably infer that the patentee does not intend to enforce its patent against the . . . infringer, (2) the . . . infringer relies on that conduct, and (3) due to its reliance, the . . . infringer will be materially prejudiced if the patentee is allowed to proceed with its claim."

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed Cir. 2001); *see A.C. Aukerman Co.*, 960 F.2d at 1028. Indeed, the patentee may mislead the infringer through inaction or silence, however, such "inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the

[infringer] is abandoned." *A.C. Aukerman Co.*, 960 F.2d at 1042.

Corning contends that it established its laches defense by presumption. First, it argues that PPC had actual knowledge of a potential infringement claim in late 2004 when it analyzed the UltraRange product for infringement. (Dkt. No. 524 at 11-12.) Corning argues that PPC's infringement contentions in this case were initially broad enough to include the 2004 version of the UltraRange and, thus, the laches period should run from when PPC was aware that it had a potential claim against that product. (*Id.* at 6-10.) PPC, however, determined that the 2004 version of the UltraRange did *not* infringe. (Dkt. No. 307 at 3; Dkt. No. 513 at 123.) Accordingly, the 2004 noninfringement finding cannot serve as the basis for PPC's actual knowledge of a potential infringement claim against Corning. *See Wanlass*, 148 F.3d at 1337 ("The period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities.")

The court is also not persuaded by Corning's contention that PPC had constructive notice of a potential claim against it in 2005. Corning cites evidence that the connector market is concentrated, and it openly and prevalently sold the UltraRange. (Dkt. No. 360 at 28; Dkt. No. 363 at 93;

9

Dkt. No. 513 at 145.)  Corning also cites a video it displayed of the 2005 version of the UltraRange at trade shows.  (Dkt. No. 363 at 82-85.) Corning notes that PPC had bags of Corning's connectors during the relevant time and could easily test them for infringement.  (Dkt. No. 513 at 120, 122-23.)  Furthermore, Corning points out that PPC conducted red dye tests of the 2005 version of the UltraRange.  (Dkt. No. 513 at 124-27.) Additionally, Corning presented evidence that PPC knew that a connector may undergo design improvements over the course of its product life cycle. (Dkt. No. 360 at 29-31.)  Finally, Corning notes that PPC actively monitored its competitors' patents, and Corning patented its design of the 2005 version of the UltraRange.  (Dkt No. 359 at 150-52; Exs. D-9, D-12.)

Corning generally cites to evidence that PPC should have known of the 2005 version of the UltraRange.  However, awareness of a product is not enough; a patentee must have actual or constructive knowledge of a product's infringement to trigger the laches clock.  *See PSN Illinois, Inc. v. Ivoclar Vivdent, Inc.*, 398 F. Supp. 2d 902, 907 (N.D. Ill. 2005) ("Knowledge of a product . . . does not automatically indicate actual or constructive knowledge of infringement.  Courts . . . have repeatedly rejected the use of the laches defenses against patentees who were aware of an infringing

product more than six years before filing suit, but were not aware of the infringement.").

Corning also marshals evidence suggesting that PPC would have known of the infringement if it had tested the 2005 version of the UltraRange for infringement. This presupposes that PPC had a continuing duty to test its competitors' products for infringement. Certainly, a patentee has a general duty to "police [its patent] rights." *Wanlass*, 148 F.3d at 1338. But that duty does not require a patentee to investigate its competitors' products absent circumstances that it should reasonably suspect infringement. *See id.*; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1465 (Fed. Cir. 1998). The duty to investigate did not arise here because PPC previously tested the 2004 version of the UltraRange, determined it did not infringe, and had no reason to believe that Corning changed its product. (Dkt. No. 359 at 117-119; Dkt. No. 360 at 10-11, 22-24, 54-55, 85-86.) In addition, the red dye tests that PPC performed on the 2005 version of the UltraRange tested for performance, not infringement, and did not require technicians to review a cross section of the cable connector. (Dkt. No. 359 at 118; Dkt. No. 513 at 140-41.) For these reasons, the court is not convinced that PPC was on notice to reasonably suspect

infringement.

Furthermore, Corning's concealment of the 2005 version of the UltraRange belies evidence suggesting that PPC had constructive knowledge of a potential infringement claim. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) (holding courts may "consider[] the effect of [an infringer's] secrecy policy on [a patentee's] efforts to protect its rights"), *abrogated on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed Cir. 1998). Despite adding new design features previously found to infringe, Corning kept the same series and model number, same outward appearance, and same catalogue and marketing materials as the 2004 version of the UltraRange. (Dkt. No. 359 at 118-20; Dkt. No. 360 at 22-23, 84-86; Dkt. No. 362 at 16-17.) Corning never sent samples or drawings of the new design to PPC. (Dkt. No. 362 at 21-22.) Burris, Corning's lead engineer, characterized the new design features as "invisible" because they were "inside the connector and would [not] be noticeable." (Dkt. No. 362 at 103-04.) Corning's conduct indicated to PPC that the UltraRange product did not change. (Dkt. No. 359 at 117-119; Dkt. No. 360 at 10-11, 22-24, 54-55, 85-86.) This evidence further bolsters the court's conclusion that PPC

should not have reasonably suspected infringement of its patents in suit in 2005.

Because Corning has not shown that PPC had actual or constructive knowledge of a potential claim six years before filing suit, it is not entitled to a presumption of laches. *See A.C. Aukerman Co.*, 960 F.2d at 1028. Nor has Corning presented any additional evidence suggesting that PPC had actual or constructive knowledge of a potential infringement claim between 2005 and 2011. Corning, therefore, has not established the first element of laches, which is fatal to its defense. *See Intirtool, Ltd.*, 369 F.3d at 1297.

To the contrary, the evidence demonstrates that PPC first learned of the infringement in 2011 and had no reason to know of a potential claim earlier. In 2011, Corning released its UltraShield connector and PPC analyzed this new product for infringement. (Dkt. No. 359 at 114; Dkt. No. 360 at 90.) PPC determined that the UltraShield included a taper which deformed the body and was previously found to infringe in the 2003 Wisconsin litigation. (Dkt. No. 359 at 114-15; Dkt. No. 360 at 90.) This prompted PPC for the first time to retest the UltraRange to confirm whether its design had changed from when it first tested it for infringement in 2004. (Dkt. No. 359 at 114-16.) After analyzing the UltraRange, the testing

revealed that it had changed and included the same taper that was found in the UltraShield product. (*Id.* at 116-17.) PPC then commenced this lawsuit that same year. (*See generally* Compl.)

Although doctrinally distinct from laches, knowledge is also a necessary component of an equitable estoppel defense. *See A.C. Aukerman Co.*, 960 F.2d at 1042. As noted above, an infringer must first show that the patentee's conduct "support[s] an inference that the patentee did not intend to press an infringement claim against the . . . infringer." *Id.* at 1042. To that end, an infringer must demonstrate that it "knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed Cir. 2016) (citing *A.C. Aukerman Co.*, 960 F.2d at 1042). Without the requisite knowledge, a patentee cannot engage in misleading conduct. *See id.* at 1331 (determining the patentee was "on notice" of the allegedly infringing activity before finding that it engaged in misleading conduct); *Lee's Aquarium & Pet Prods., Inc. v. Python Prods., Inc.*, Nos. 97-1278, 97-1328, 1998 WL 129903, at *4-5 (Fed. Cir. 1998) (finding no misleading conduct when the patentee did not know or should not have reasonably known of the allegedly infringing activity); *Yeda Research &*

14

*Dev. Co. Ltd. v. Imclone Sys., Inc.*, No. 03 Civ. 8484, 2005 WL 2923545, at *8 (S.D.N.Y. 2005) (noting that equitable estoppel requires a finding that "the party estopped had a clear basis for knowledge" of the allegedly infringing activity).

Corning contends that PPC mislead it by not pursuing infringement claims against the -59-HEC, -7, and -11 UltraSeal products, which Corning based its UltraRange design on. (Dkt. No. 524 at 15-16.) Additionally, Corning argues that PPC mislead it when it did not accuse the 2004 version of the UltraRange of infringement. (*Id.* at 16-17.) Finally, Corning maintains that the above actions followed by PPC's silence until this litigation is further evidence of misleading conduct. (*Id.*)

At trial, however, Corning conceded that the above referenced UltraSeal products and the 2004 version of the UltraRange are different than the accused 2005 version of the UltraRange. (Dkt. No. 513 at 34-43; Dkt. No. 511, Attach. 4 at 20.) Accordingly, any representation with respect to these products cannot form the basis of a misrepresentation against the 2005 version of the UltraRange or the UltraShield products. *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1425 (Fed. Cir. 1997) (holding a patentee's communications with an infringing company

15

about a different product cannot support a misrepresentation about the infringing product).

As discussed with respect to laches, PPC did not have actual knowledge that the UltraRange or UltraShield products infringed either of its patents in suit before 2011. Furthermore, Corning could not reasonably infer that PPC had constructive knowledge of its infringement before then. PPC had no duty to investigate as it did not reasonably suspect infringement nor did its awareness of the UltraRange product line give rise to such duty. *See Wanlass*, 148 F.3d at 1338; *PSN Illinois, Inc.*, 398 F. Supp. 2d at 907. For these reasons, Corning cannot rely on PPC's silence to prove estoppel. *See A.C. Aukerman Co.*, 960 F.2d at 1043 ("[S]ilence alone will not create an estoppel unless there was a clear duty to speak."). As such, Corning has not proven that PPC engaged in misleading conduct that it had abandoned its patent claim and, accordingly, the evidence does not support an equitable estoppel defense. **B.      Enhanced Damages**

Courts have the discretion to award "damages up to three times the amount found or assessed" on findings of patent infringement. 35 U.S.C. § 284; *see Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933-34 (2016). Courts must consider the totality of the circumstances and are

guided by a nine-factor test to assess whether and by what amount to award enhanced damages. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).[2] Accordingly, courts should assess: (1) whether the infringer deliberately copied the patentee's ideas or design; (2) whether the infringer, upon knowing of the patent, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the infringer's litigation behavior; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) remedial action taken by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *See id.* at 827. Ultimately, consideration of the *Read* factors measures the infringer's culpability, and enhanced damages are punitive and should be awarded for "egregious cases of misconduct beyond typical infringement" including "cases typified by willful misconduct" or "deliberate or wanton" infringement. *Halo Elecs., Inc.*, 136 S. Ct. at 1934, 1935-36 (internal

---

[2] Courts continue to apply the *Read* factors to determine whether to enhance damages after the Supreme Court's decision in *Halo. See, e.g., WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1325, 1339-42 (Fed. Cir. 2016).

quotation marks and citation omitted).  A party must show that it is entitled to enhanced damages by a preponderance of the evidence.  *See id.* at 1934.

PPC argues that damages should be trebled because of the jury's willfulness finding, evidence of Corning copying PPC's patents, Corning's continued sales of the infringing product after PPC filed this action, and Corning's vexatious litigation tactics.  (Dkt. No. 517 at 31-35.)  Corning counters that no enhancement is warranted because it did not return to its previous infringing design, it openly sold the accused products, it had a strong position that its accused products were noninfringing, and it stopped sales of the accused design after the jury's verdict.  (Dkt. No. 420 at 7.)

### 1. *Deliberate Copying*

PPC argues that Corning deliberately copied its 194 Patent when it added the taper that deformed the connector's body member to the accused products.  (Dkt. No. 412, Attach. 1 at 10-11.)  PPC contends that Corning was aware that this taper was infringing because the same design was found to infringe in the 2003 Wisconsin litigation.  (*Id.* at 10.)  Corning maintains that it did not copy PPC's patent because it independently developed its products.  (Dkt. No. 420 at 7-8.)  Specifically, Corning

asserts that it avoided the 194 Patent when designing the new UltraRange connector and instead relied on its noninfringing UltraSeal products. (*Id.*)

While Corning may have designed the 2004 version of the UltraRange around PPC's patents, the same cannot be said for the accused products. Rather, the evidence supports the conclusion that Corning deliberately copied PPC's patents. Corning knew that the taper which deformed the connector's body member infringed the 194 Patent. (Dkt. No. 360 at 17-18.) Nevertheless, Corning added this taper to the 2005 version of the UltraRange and the UltraShield. (Dkt. No. 359 at 109-20; Dkt. No. 360 at 88-91.) Indeed, the jury found that Corning willfully infringed PPC's patents in suit after being instructed that it could consider what would or should have been obvious to Corning when it sold its accused products. (Dkt. No. 365 at 157-58; Dkt. No. 358.) The court, therefore, finds that this factor supports enhancement. *See nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 387-88 (D. Del. 2004) (finding deliberate copying supported enhancing damages based in part on the jury's finding of willful infringement and the public availability of the design information underlying the patent), *aff'd* 436 F.3d 1317 (Fed Cir. 2006).

## 2.  *Good Faith Belief of Invalidity or Noninfringement*

PPC contends that Corning did not have a good faith belief that either of PPC's patents in suit were invalid or that Corning's accused products did not infringe.  (Dkt. No. 412, Attach. 1 at 15-18.)  PPC notes that Corning was either precluded from arguing invalidity or waived its invalidity defense against the patents in suit.  (*Id.* at 16; Dkt. No. 208; Dkt. No. 446 at 29-30.)  Furthermore, PPC argues that Corning did not present evidence of a proper investigation into PPC's infringement allegations, did not provide an opinion of counsel, and improperly relied on the 2013 Court of International Trade decision as a basis for its good faith.  (Dkt. No. 412, Attach. 1 at 15-18.)

Corning maintains that its legal department approved the UltraRange product line and also determined that the gripper connectors in its UltraSeal product line did not infringe after it investigated the scope of the 194 and 940 Patents during the 2003 Wisconsin litigation and subsequent settlement.  (Dkt. No. 524 at 21.)  Corning based its design of the UltraRange on the non-infringing UltraSeal gripper connectors.  (Dkt. No. 513 at 14-17.)  After PPC commenced this action, Corning asserts that its head of operations thoroughly investigated the claims by speaking with in-

house and outside counsel.  (Dkt. No. 420 at 13.)  Finally, Corning states

that the 2013 Court of International Trade decision supported its belief that

its accused connectors did not infringe.  (*Id.*)

The court finds that this factor supports enhancement.  While

Corning did receive legal advice about the UltraRange before its launch,

this advice was directed at the 2004 version of the UltraRange and not the

accused products.  (Dkt. No. 511, Attach. 4 at 11.)  Similarly, Corning

evaluated the scope of the patents in suit with regard to the UltraSeal

product line and not the accused products.  (Dkt. No. 513 at 73; Dkt. No.

514 at 53-54; Ex. D-1079 at 7 ¶ 20.)  Corning spoke with counsel after

PPC commenced this suit but failed to provide a formal opinion regarding

noninfringement.  (Dkt. No. 362 at 29); *see Hako-Med USA, Inc. v. Axiom

Worldwide, Inc.*, No. 8:06-cv-1790-T-33, 2009 WL 3064800, at *9 (M.D. Fl.

Sept. 22, 2009) (noting that whether the infringer obtained and presented a

legal opinion is still relevant "[u]nder a *Read* factor analysis" based on the

"'totality of the circumstances'"); *see also Aspex Eyewear, Inc. v. Clariti

Eyewear, Inc.*, 605 F.3d 1305, 1313 (Fed. Cir. 2010).  Finally, Corning's

reliance on the 2013 Court of International Trade opinion is misplaced

because it was decided years after Corning knew of both PPC's patents

21

and infringement allegations.  *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) (finding the relevant time to assess infringement is when the infringer had notice of the patent).  Because the evidence shows that Corning did not have a good faith belief in its noninfringement defense, this factor supports enhancement.

### 3. *Corning's Litigation Behavior*

PPC contends that Corning wasted the court's time with a bench trial on its baseless affirmative defenses, violated numerous court orders, dropped its invalidity defense after four years of litigation, and belatedly added an affirmative defense without support.  (Dkt. No. 412, Attach. 1 at 18-25; Dkt. No. 517 at 34-35.)  The Federal Circuit has held that litigation misconduct "[t]ypically . . . refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation."  *i4i Ltd P'Ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010).  The conduct of Corning or its counsel cannot be characterized as more than zealous advocacy in high stakes litigation.  Notably, several of Corning's affirmative defenses survived summary judgment requiring a bench trial, indicating that its positions were neither "vexatious or unjustified."  *Id.*; (Dkt. No. 209.)  Furthermore, both

22

parties acted professionally throughout trial.  (Dkt. No. 365 at 196-97); *see*

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, No. 14-cv-62369,

2016 WL 4249951, at *7 (S.D. Fla. July 27, 2016) (finding counsel's

professional trial behavior weighed against enhancement).  Accordingly,

the court finds this factor weighs against enhancement.

4.    *Corning's Size and Financial Condition*

The fourth *Read* factor supports an enhancement because Corning

has substantial resources.  *See Johns Hopkins Univ. v. CellPro*, 978 F.

Supp. 184, 195 (D. Del. 1997) ("Punishing a larger company in a stronger

financial condition may call for higher damages, where a lower number

may be equally effective in punishing a smaller company.")  At trial,

Corning reported having annual revenues of approximately two billion

dollars and, therefore, can afford to pay enhanced damages up to the

maximum statutory amount.  (Dkt. No. 362 at 16-17.)

5.    *Closeness of the Case*

PPC argues that the case was not close because the jury only spent

one hour in deliberations to find that Corning willfully infringed on its

patents in suit.  (Dkt. No. 412, Attach. 1 at 18.)  Corning cites cases

contesting PPC's proposition, (Dkt. No. 420 at 15-16), and maintains the

case was close because the court denied PPC's motion for summary judgment on infringement and its defenses of laches and equitable estoppel, and the case was ultimately tried. (*Id.* at 15.)

The court agrees with Corning that it cannot draw an inference about the closeness of the case from the length of jury deliberations. *See, e.g.*, *Floe Int'l, Inc. v. Newmans' Mfg. Inc.*, No. 04-5120, 2006 WL 2472112, at *5 (D. Minn. Aug. 23, 2006) ("The length of jury deliberations generally does not indicate whether a case is close or not."). Nevertheless, based on the evidence, the case was not particularly close. PPC presented evidence demonstrating that Corning willfully infringed on both its 194 and 940 Patents, which the jury credited and rendered a verdict in its favor. (Dkt. No. 358.) The court determined that the jury's verdict was supported by legally sufficient evidence. (Dkt. No. 446.) Furthermore, all of Corning's defenses have been rejected on summary judgment or by bench decision. (*Id.*; Part III.A.) Corning's position as to infringement, laches, and equitable estoppel may have required resolution at trial, however, this fact does not dictate that the case was close. *See nCUBE Corp.*, 313 F. Supp. 2d at 390 (rejecting the survival of a defense on summary judgment as evidence of a close case). Accordingly, the court finds this factor weighs in

24

favor of enhancement.

      *6 & 7.      Duration of the Misconduct & Remedial Action*

      PPC maintains that Corning has infringed since 2005 and failed to take remedial action.  (Dkt. No. 517 at 33-34.)  PPC argues that Corning continued to sell its accused products until the jury verdict.  (*Id.* at 33.)  Corning contends that it took remedial action when it introduced its C3 connector in 2014, which, according to Corning, was a non-infringing alternative design.  (Dkt. No. 420 at 13-14.)  Furthermore, Corning asserts that it took "immediate steps to respect the jury verdict" and stopped selling the accused products after that date.  (*Id.* at 14.)

      Corning was aware of PPC's patents when it developed the accused products.  (Dkt. No. 362 at 53-54.)  The jury found that Corning's accused products, developed in 2005 and 2010, infringed on PPC's patents in suit in 2015, (Dkt. No. 358), and, thereafter, Corning took those infringing products off the market, (Dkt. No. 513 at 172, 175).  Ten years of misconduct weighs in favor of an enhancement.  *See, e.g.*, *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07cv1200, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (finding six years of misconduct was "substantial," favoring enhancement); *Broadcom Corp. v. Qualcomm Inc.*, No. SACV 05-467-JVS,

2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007). Likewise, continuing to sell the infringing products after notice of infringement and during the course of litigation supports enhancement. *See Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 611 (D. Del. 2007). The length of Corning's infringement supports a damages enhancement.

On the other hand, Corning remedied some of its infringement by selling the converted C3 connectors, which the parties stipulated would not be part of the case nor accused of infringement of the patents in suit. (Dkt. No. 349; Dkt. No. 420, Attach. 4 ¶ 8.) Because Corning engaged in some remedial action, this factor weighs against enhancement.

8.    *Corning's Motivation for Harm*

PPC contends that Corning's infringement was motivated by greed and economic gain, (Dkt. No. 412, Attach. 1 at 13), while Corning argues it engaged in fair competition and had no desire to steal PPC's intellectual property, (Dkt. No. 420 at 12). The court finds that this factor weighs in

26

favor of enhancement. Corning's customers complained about the 2004 version of the UltraRange, and Corning redesigned its product by adding the taper which was previously found to infringe PPC's patents. (Dkt. No. 359 at 116-20; Dkt. No. 360 at 17-22, 88-91; Dkt. No. 362 at 7-13, 15-16, 62-63, 67-69; Dkt. No. 513 at 18.) This evidence demonstrates that Corning would rather knowingly infringe than invest the time and resources to redesign its connector. In addition, the evidence supports the inference that Corning intended to harm PPC by diverting business away from PPC. (Dkt. No. 361 at 12-13); *see Power Intergrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F. Supp. 2d 710, 724 (D. Del. 2011) ("[T]he evidence of motivation to harm becomes greater when the patentee and infringer are in direct competition, and the accused infringer's actions are specifically intended to take business away from the patent owner."), *vacated on other grounds*, 711 F.3d 1348 (Fed. Cir. 2013).

> *9.    Concealment*

Finally, as exhaustively discussed and argued with respect to the affirmative defenses, this factor strongly supports enhancement. (Part III.A at 12-13.) Corning concealed its infringement by identifying and advertising the redesigned UltraRange in the same way as the 2004

version.  (*Id.*)  Corning's lead engineer testified that the new features were

"invisible," (Dkt. No. 362 at 103-04), leading PPC to conclude that the

UltraRange had not been redesigned, (Dkt. No. 359 at 117-19; Dkt.

No. 360 at 10-11, 22-24, 54-55, 85-86).

In sum, the *Read* factors decidedly support enhancement.

Additionally, the jury found that Corning's infringement was willful, which

was supported by substantial evidence.  (Dkt. Nos. 358, 446.)  Based on

all the facts and circumstances, enhanced damages are warranted as PPC

has shown that Corning copied its patents, did not have a good faith basis

for its noninfringement defense, and concealed its infringement,

demonstrating that it engaged in egregious infringement behavior.  *See*

*Halo Elecs., Inc.*, 136 S. Ct. at 1932.  Without a doubt, "[t]here is a

spectrum of improper conduct."  *Cleancut, LLC v. Rug Doctor, Inc.*, No.

2:08-cv-836, 2013 WL 441209, at *4 (D. Utah Feb. 5, 2013).  Although

Corning's misconduct warrants an enhancement, it is "not a polar case" at

"the most egregious end of the spectrum."  *Id.* (awarding double not treble

damages after finding that the totality of the circumstances and six *Read*

factors supported an enhancement).  The court exercises its discretion and

finds that doubling the damages award is a sufficient "'punitive' or

'vindictive' sanction" for Corning's misconduct. *Halo Elecs., Inc.*, 136 S. Ct. at 1932; *see Dominion Res. Inc. v. Alstom Grid, Inc.*, No. 15-224, 2016 WL 5674713, at *20-24 (E.D. Pa. Oct. 3, 2016) (awarding double damages because of the jury's willfulness finding and two *Read* factors weighed in infringer's favor). Accordingly, the jury's damages verdict of $23.85 million is doubled to $47.7 million.

**C.    Attorneys' Fees**

Courts may award a prevailing party attorneys' fees in "exceptional cases" and will exercise their discretion to determine whether a case meets this standard depending on the totality of the circumstances. 35 U.S.C. § 285; *see Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Courts are instructed "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness*, 134 S. Ct. at 1756. In making this determination, courts should consider the "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance

considerations of compensation and deterrence." *Id.* at 1756 n.6. Fee awards may be appropriate in "case[s] presenting either subjective bad faith or exceptionally meritless claims." *Id.* at 1757. Entitlement to fees is measured by a preponderance of the evidence standard. *See id.* at 1758.

PPC contends that it is entitled to attorneys' fees for essentially the same reasons that it insists Corning engaged in litigation misconduct under the *Read* factors. (Dkt. No. 412, Attach. 1 at 20-25; Dkt. No. 517 at 34-35.) Corning counters that its positions were reasonable and its litigation behavior was proper. (Dkt. No. 420 at 19-24.)

This case is not exceptional. Although the jury ultimately found for PPC and the court rejected Corning's defenses, Corning's positions were not wholly without merit. *See SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1347-48 (Fed Cir. 2015) (finding what matters is the "substantive *strength*, not the *correctness* or eventual success of that position"). Indeed, both Corning's equitable estoppel and laches defenses survived summary judgment and the court did not find infringement on summary judgment. (Dkt. Nos. 207, 209.) In total, Corning's positions were not unreasonable warranting a fee award. *See EON Corp. IP Holdings LLC v. Cisco Sys. Inc.*, 12-CV-01011, 2014 WL 372617, at *5 (N.D. Cal. July 25,

2014) (denying fees where a party's argument was "quite stretched" and its conduct "difficult to explain," the court could not "quite conclude that *no* reasonable patentee could see an opening . . . through which the argument could be squeezed"); *Gameteck LLC v. Zynga, Inc.*, CV 13-2546, 2014 WL 4351414, at *3 (N.D. Cal. Sept. 2, 2014) (denying fees where party's briefing "consisted of granular parsing of the claimed steps rather than any substantive explanation of how [the invention] differed from the underlying abstract idea," it "did not, however, descend to the level of frivolous argument or objective unreasonableness"). For the same reasons discussed with respect to the third *Read* factor, Corning's litigation behavior does not warrant a fee award. *See Small v. Implant Direct Mfg. LLC*, No. 06 Civ. 683, 2014 WL 5463621, at *4 (S.D.N.Y. Oct. 23, 2014) (noting that post-*Octane* "most cases awarding fees continue to involve substantial litigation misconduct"); *cf. Homeland Housewares, LLC v. Hastie2Market, LLC*, 581 F. App'x 877, 878 (Fed. Cir. 2014) (upholding fee award where the party filed unsolicited briefs and multiple meritless reconsideration motions and failed to introduce admissible evidence to support its claim). Accordingly, PPC's motion for attorneys' fees is denied.

**D.      Prejudgment Interest**

PPC seeks prejudgment interest on its damages award at the New York statutory rate of nine percent per annum running from the first date of eligible recovery,[3] or July 5, 2005, until the date of entry of judgment.  (Dkt. No. 409, Attach. 1 at 8-9.)  Corning argues that PPC's prejudgment interest calculation grants it an improper windfall.  (Dkt. No. 424 at 2-7.)  Corning instead advocates that the court calculate interest by applying the T-bill interest rate compounded annually to Corning's annual sales of its infringing products.  (*Id.* at 2, 6-7.)

A successful patent owner is generally entitled to prejudgment interest on its damages award.  *See* 35 U.S.C. § 284 ("[T]he court shall award . . . damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court.").  To that end, "prejudgment interest should be awarded under [section] 284 absent some justification for withholding such award."  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983).  The purpose of prejudgment interest is not to punish the infringer but to compensate the patent owner for "the loss of any possible use of the money between the time of the infringement and

---

[3]  PPC asserts that Corning's infringement began on March 24, 2005 but acknowledges that by statute it is not entitled to damages for infringement committed more than six years before it filed the complaint.  (Dkt. No. 409, Attach. 1 at 8-9, citing 35 U.S.C. § 286.)

the date of the judgment." *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389 (Fed Cir. 1983), *overruled on other grounds*, *In re Seagate Tech.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

The federal statute does not fix an interest rate, and courts have the discretion to set it accordingly. *See Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed Cir. 1986). Courts have used both the T-bill rate and state statutory rates. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (T-bill rate); *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1028 (Fed. Cir. 1996) (state statutory rate).

In exercising its discretion, the court awards PPC prejudgment interest at the New York state statutory rate of nine percent per annum. *See* N.Y. C.P.L.R. § 5004. However, the court agrees with Corning that prejudgment interest should be calculated on Corning's annual sales of its infringing products. This calculation more accurately restores PPC to the financial position it would have been in but for Corning's infringement. *See Dragan v. L.D. Caulk Co.*, CIV. A. No. 84-707, 1989 WL 133536, at *13 (D. Del. Apr. 21, 1989) (calculating prejudgment interest based on yearly sales rather than the date of first infringement).

## IV. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that PPC's motion for enhanced damages and attorneys' fees (Dkt. No. 412) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** with respect to enhanced damages and that the rate of enhancement is doubled to the amount of $47.7 million; and

> **DENIED** with respect to attorneys' fees; and it is further

**ORDERED** that PPC's motion for prejudgment interest (Dkt. No. 409) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** to the extent that the prejudgment interest rate is the New York statutory rate of nine percent per annum; and

> **DENIED** in all other respects; and it is further

**ORDERED** that interest shall be calculated on Corning's annual sales of the infringing products; and it is further

**ORDERED** that the parties shall jointly submit a calculation of prejudgment interest consistent with this Memorandum-Decision within fourteen (14) days of the date of this Memorandum-Decision and Order; and it is further

34

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

November 3, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge